**727OBJ, APPEAL**

# U.S. Bankruptcy Court
## Eastern District of New York (Central Islip)
## Bankruptcy Petition #: 8–14–72941–las

*Date filed:* 06/25/2014
*341 meeting:* 04/22/2015
*Deadline for filing claims:* 05/21/2015
*Deadline for objecting to discharge:* 04/30/2016
*Deadline for financial mgmt. course:* 05/11/2015

*Assigned to:* Judge Louis A. Scarcella
Chapter 7
Involuntary
Asset

*Debtor*
**Gershon Barkany**
1 Andover Lane
Woodmere, NY 11598
NASSAU–NY
SSN / ITIN: xxx–xx–4917

represented by **Michael Jude Jannuzzi**
775 Park Ave
Suite 205
Huntington, NY 11743
(631) 385–8182
Email: thejanuz@aol.com

**Edward E Neiger**
ASK LLP
151 West 46th Street
4th Floor
New York, NY 10036
212–267–7342
*TERMINATED: 09/09/2014*

*Petitioning Creditor*
**Joseph Rosenberg**
14 Sands Point Road
Monsey, NY 10952
*TERMINATED: 01/14/2015*

represented by **Jonathan Mark Agudelo**
Kaye Scholer LLP
250 West 55th Street
New York, NY 10019–9710
212–836–8114
*TERMINATED: 01/14/2015*

**Lester M Kirshenbaum**
Kaye Scholer LLP
250 West 55th Street
New York, NY 10019–9710
212–836–8763
*TERMINATED: 01/14/2015*

*Petitioning Creditor*
**Marina District Development Co., LLC**
One Borgata Way
Atlantic City, NJ 08401
*TERMINATED: 01/14/2015*

represented by **Jeremy Klausner**
Agostino & Associates PC
14 Washington Place
Hackensack, NJ 07601
201–488–5400
*TERMINATED: 01/14/2015*

*Petitioning Creditor*
**Saul Kessler**
517 Oak Drive
Far Rockaway, NY 11691
*TERMINATED: 01/14/2015*

represented by **Kramer & Shapiro**
80–02 Kew Gardens Road
Kew Gardens, NY 11415
(718) 520–1600
*TERMINATED: 01/14/2015*

**Lisa D Levine–Shapiro**
Law Office of Kramer & Shapiro PC

80–02 Kew Gardens Road
Suite 302
Kew Gardens, NY 11415
718–520–1600
*TERMINATED: 01/14/2015*

**Robert J Spence**
Spence Law Office, P.C.
500 North Broadway
Suite 149
Jericho, NY 11753
(516) 336–2060
Fax : (516)605–2084
Email: rspence@spencelawpc.com

*Petitioning Creditor*
**Jonathan Rosenberg**

represented by **Lester M Kirshenbaum**
(See above for address)

*Trustee*
**Marc A Pergament**
Weinberg Gross & Pergament
400 Garden City Plaza
Suite 403
Garden City, NY 11530
(516) 877–2424
Email: mpergament@wgplaw.com

represented by **Marc A Pergament**
Weinberg Gross & Pergament
400 Garden City Plaza
Suite 403
Garden City, NY 11530
(516) 877–2424
Email: mpergament@wgplaw.com

**Weinberg, Gross & Pergament LLP**
400 Garden City Plaza
Suite 403
Garden City, NY 11530
(516) 877–2424

*Trustee*
**Mark Frankel**

represented by **Mark A. Frankel**
Backenroth Frankel & Krinsky LLP
800 Third Avenue
11th Floor
New York, NY 10022
(212) 593–1100
Fax : (212) 644–0544
Email: mfrankel@bfklaw.com

*Trustee*
**Mark Frankel**
Backenroth Frankel & Krinsky
489 Fifth Ave
New York, NY 10017
(212) 593–1100
Email: mfrankel@bfklaw.com

*Trustee*
**Mark A. Frankel**

represented by **Edward L Schnitzer**
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022
212–478–7215
Fax : 212–478–7400
Email: eschnitzer@hahnhessen.com

*U.S. Trustee*
**United States Trustee**
Long Island Federal Courthouse
560 Federal Plaza – Room 560

Central Islip, NY 11722–4437
(631) 715–7800

**Clerk of**
**The Court**
Long Island Federal Courthouse
290 Federal Plaza
Central Islip, NY 11722
(631)

| Filing Date | | # | Docket Text |
|---|---|---|---|
| 05/26/2015 | | 210 | Affidavit/Certificate of Service Filed by Lester M Kirshenbaum on behalf of Jonathan Zelinger, Ethical Products Inc. and Petex International, Joseph Rosenberg (RE: related document(s)202 Memorandum of Law in Opposition filed by Creditor Joseph Rosenberg, Creditor Jonathan Zelinger, Ethical Products Inc. and Petex International, 204 Declaration filed by Creditor Joseph Rosenberg, Creditor Jonathan Zelinger, Ethical Products Inc. and Petex International, 208 Exhibit filed by Creditor Joseph Rosenberg, Creditor Jonathan Zelinger, Ethical Products Inc. and Petex International) (Kirshenbaum, Lester) (Entered: 05/26/2015) |
| 12/29/2015 | | 289 | Memorandum Decision and Order. The objections to the motion of the CanadianNorthern Creditors to resolve the election controversy in favor of Mr. Frankel are overruled. Mr. Frankel shall be appointed as the permanent chapter 7 trustee. Mr Pergament to turn over any books and records no later then January 15, 2016. All motions and adversary proceeding brought by or against the chapter 7 trustee shall be held in abeyance for forty–five days. A status conference shall be held on February 4, 2016 at 11:30 a.m.(RE: related document(s)200 Motion to Appoint Trustee filed by Creditor L'Chayim Foundation, Inc., Creditor 169 16th Street, LLC, Creditor Ludvick and Eva Hilman Family Partnership, Creditor WL Metro Equity Holdings, LLC, Creditor LAW OFFICES OF ALLAN LEBOVITS, P.C., AS NOMINEE). Signed on 12/29/2015 (cam) (Entered: 12/29/2015) |
| 01/12/2016 | | 298 | Notice of Appeal to District Court. . Fee Amount $298 Filed by Michael S Amato, Motty Shulman, Robert J Spence, Lester M Kirshenbaum on behalf of Joseph Rosenberg, Jonathan Zelinger, Ethical Products Inc. and Petex International Limited., Saul Kessler, Jonathan Zelinger, Murray Leifer, Sara Leifer, Edward Lowy, Alfred Schonberger, Whitefish Group, LLC (RE: related document(s)289 Opinion/Decision for External Web Page). Appellant Designation due by 01/26/2016. (Attachments: # 1 Civil Cover Sheet # 2 Exhibit A)(Kirshenbaum, Lester) (Entered: 01/12/2016) |
| 01/12/2016 | | | Receipt of Notice of Appeal(8–14–72941–las) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number 14060019. Fee amount 298.00. (re: Doc# 298) (U.S. Treasury) (Entered: 01/12/2016) |
| 01/12/2016 | | 300 | Affidavit/Certificate of Service Filed by Lester M Kirshenbaum on behalf of Joseph Rosenberg, Jonathan Zelinger, Ethical Products Inc. and Petex International Limited. (RE: related document(s)298 Notice of Appeal filed by Petitioning Creditor Saul Kessler, Creditor Alfred Schonberger, Creditor Edward Lowy, Creditor Jonathan Zelinger, Creditor Murray Leifer, Creditor Sara Leifer, Creditor Whitefish Group, LLC, Creditor Joseph Rosenberg, Jonathan Zelinger, Ethical Products Inc. and Petex International Limited.) (Kirshenbaum, Lester) (Entered: 01/12/2016) |

| | | | |
|---|---|---|---|
| 01/13/2016 | | <u>301</u> | Notice to Parties of requirements, deadlines (RE: related document(s)<u>298</u> Notice of Appeal filed by Petitioning Creditor Saul Kessler, Creditor Alfred Schonberger, Creditor Edward Lowy, Creditor Jonathan Leifer, Creditor Murray Leifer, Creditor Sara Leifer, Creditor Whitefish Group, LLC, Creditor Joseph Rosenberg, Jonathan Zelinger, Ethical Products Inc. and Petex International Limited.) (sld) (Entered: 01/13/2016) |

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

In re:                                                  :
                                                        :    Chapter No. 8-14-72941-las
                                                        :
**GERSHON BARKANY,**                                    :    Chapter 7
                                                        :
                                                        :
                        Debtor.                         :
-----------------------------------------------------------x

### AFFIDAVIT OF SERVICE

STATE OF NEW YORK          :
                           :.ss:
COUNTY OF NEW YORK   :

  TIMOTHY S. LANGSDORF, being duly sworn, deposes and says that he is employed by the law firm of Kaye Scholer LLP, is over the age of eighteen years and is not a party to this action.

  On May 22, 2015, deponent served a true and correct copy of (i) *Creditor's Opposition to Motions Requesting Order Confirming Election of Mark A. Frankel as Trustee* [Docket #202]; (ii) *Declaration of Johnathan M. Agudelo and Exhibit 1* [Docket #204]; and (iii) *Exhibit 2 to the Declaration of Johnathan M. Agudelo* [Docket #208] by electronic mail upon the parties listed in Exhibit A.

                     Timothy S. Langsdorf

Sworn to before me this
20th day of May, 2015

_____
Notary Public, State of New York

CYNTHIA M. ALBERT
Notary Public, State of New York
No. 01AL6321409
Qualified in Bronx County
Certificate Filed in New York County
Commission Expires March 16, 2019

62450645.DOCX       1

Exhibit A

Michael Jude Jannuzzi
775 Park Avenue
Huntington, NY 11743
Thejanuz@aol.com

Edward G. Warren
Vouté Lohrfink Magro & McAndrew, LLP
170 Hamilton Avenue
White Plains, NY 10601
edwardwarren@vlmmc-law.com

Jeremy Klausner
Agostino & Associates PC
14 Washington Place
Hackensack, NJ 07601
jklausner@agostinolaw.com

Lisa Levine-Shapiro
Law Office of Kramer & Shapiro, P.C.
80-02 Kew Gardens Road, Suite 302
Kew Gardens, NY 11415
llevineshapiro@kramerandshapiro.com

Michael S. Held
Jonathan Neerman
Jackson Walker, L.L.P.
901 Main Street, Suite 6000
Dallas, TX 75202
mheld@jw.com
jneerman@jw.com

Shalom Jacob
Allen C. Wasserman
Alan H. Katz
Locke Lord LLP
3 World Financial Center
New York, NY 10281
sjacob@lockelord.com
awasserman@lockelord.com
akatz@lockelord.com

Motty Shulman
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504
mshulman@bsfllp.com

Mark S. Mulholland
Michael S. Amato
Ruskin Moscou Faltischek, P.C.
1425 RXR Plaza, East Tower 15th Floor
Uniondale, NY 11556-1425
mmulholland@rmfpc.com
mamato@rmfpc.com

Joel S. Schneck
Evan R. Shusterman
Goldberg & Rimberg PLLC
115 Broadway, Suite 302
New York, NY 10006
jss@grlawpllc.com
ers@grlawpllc.com

Jennifer L. Hartmann
Ruskin Moscou Faltischek, P.C.
1425 RXR Plaza, East Tower 15th Floor
Uniondale, NY 11556-1425
jhartmann@rmfpc.com

Robert J. Spence
Spence Law Office, P.C.
500 North Broadway
Suite 149
Jericho, NY 11753
rspence@spencelawpc.com

Marc A. Pergament
Weinberg Gross & Pergament
400 Garden City Plaza
Suite 403
Garden City, NY 11530
mpergament@wgplaw.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re

GERSHON BARKANY,

                     Debtor.
-------------------------------------------------------X

Chapter 7

Case No.: 14-72941-las

## MEMORANDUM DECISION AND ORDER

*Appearances:*

| | |
|---|---|
| Marc Pergament, Esq. | Ruskin Moscou Faltischek, P.C. |
| *Interim Chapter 7 Trustee* | *Attorneys for Whitefish Group LLC, Edward Lowy,* |
| Weinberg Gross & Pergament | *Jonathan Liefer, Murray Leifer, and Sara Leifer* |
| 400 Garden City Plaza | By: Michael S. Amato, Esq. |
| Garden City, NY 11530 | 1425 RXR Plaza |
| | East Tower, 15th Floor |
| | Uniondale, NY 11556 |
| | |
| Weinberg Gross & Pergament | Schachter Portnoy, L.L.C. |
| *Attorneys for the Interim Chapter 7 Trustee* | *Attorneys for 16916th Street, LLC, WL Metro Equity Holdings,* |
| By: Marc Weingard, Esq. | *LLC, L'Chayim Foundation, Inc., Ludvik and Eva Family* |
| 400 Garden City Plaza | *Partnership and Law Offices of Allan Lebovits, P.C.* |
| Garden City, NY 11530 | By: Joel S. Schneck, Esq. |
| | 3490 US Route 1 |
| | Princeton, NJ 08540 |
| | |
| Kaye Scholer LLP | Locke Lord LLP |
| *Attorneys for Joseph Rosenberg* | *Attorneys for Barkany Asset Recovery & Management LLC* |
| By: Lester M. Kirschenbaum, Esq. | By: Allen C. Wasserman, Esq. |
| Jonathan M Agudelo, Esq. | Shalom Jacob, Esq. |
| 250 West 55th Street | Alan H. Katz, Esq. |
| New York, NY 10019 | 1155 Avenue of the Americas |
| | New York, NY 10036 |
| | |
| Spence Law Office, P.C. | Vorte Lohrfink Magro & McAndrew LLP |
| *Attorneys for Saul Kessler* | *Attorneys for Zucker & Kwestel, LLP and Steven Kwestel* |
| By: Robert J. Spence, Esq. | By: Edward G. Warren, Esq. |
| 500 North Broadway, Suite 149 | 170 Hamilton Avenue |
| Jericho, NY 11753 | White Plains, NY 10601 |

Hon. Louis A. Scarcella, United States Bankruptcy Judge

Before the Court is a motion to resolve the disputed election of the permanent chapter 7 trustee for the bankruptcy estate of Gershon Barkany ("Barkany" or the "Debtor") brought by 169 16th Street, LLC, WL Metro Equity Holdings, LLC, L'Chayim Foundation, Inc., Law Offices of Allan Lebovits, P.C., and Ludvik & Eva Hilman Family Partnership, L.P. (collectively, the "Canadian Northern Creditors"). [ECF No. 200]. The interim trustee and certain creditors opposed the motion. [ECF Nos. 202, 203, 205, 206 and 207]. At issue is whether the Canadian Northern Creditors hold an interest materially adverse to other creditors of this bankruptcy estate, and therefore, are ineligible under 11 U.S.C. § 702(a)(2) to request for and vote at the election of the permanent chapter 7 trustee. Having considered the submissions of the parties, the relevant law, and the record in this case, and for the reasons explained below, the Court hereby finds that the Canadian Northern Creditors do not have an interest materially adverse to the interests of other creditors, and are eligible to request that a trustee election be held and to vote for the permanent trustee. The following constitutes the Court's findings of fact and conclusions of law[1] pursuant to Fed. R. Civ. P. 52(a)(1), as incorporated into Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and applied to contested matters in bankruptcy cases.

<u>JURISDICTION AND VENUE</u>

Subject matter jurisdiction lies under 28 U.S.C. § 1334. The district court may refer proceedings to a bankruptcy judge under 28 U.S.C. § 157, and this matter is referred here by the Standing Order of Reference entered by the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 157(a), dated August 28, 1986, as amended by Order dated December 5, 2012, effective *nunc pro tunc* as of June 23, 2011. Venue lies under 28 U.S.C. § 1409. This matter is a contested election of a permanent trustee, and is therefore a core proceeding. 28 U.S.C. § 157(b)(2)(A). A bankruptcy judge may hear and finally decide any core proceeding. 28 U.S.C. § 157(b)(1). A contested election under 11 U.S.C. § 702 "stems from the bankruptcy itself," and may constitutionally be decided by a bankruptcy judge. <u>Stern v. Marshall</u>, 131 S. Ct. 2594, 2618 (2011). Accordingly final judgment is within the scope of the Court's jurisdictional and constitutional authority.

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

<u>BACKGROUND AND PROCEDURAL HISTORY</u>[2]

I.      Events Leading Up to the Bankruptcy.

This bankruptcy case arises from two fraudulent business schemes conducted by Barkany between 2008 and 2013, by which he induced investors to believe that they were investing in bona fide real estate ventures.

A.   The First Investment Scheme.

Between 2008 and 2010, Barkany carried out the first fraudulent investment scheme against Cortland Realty Investments, LLC, Jordan Most, Seth Farbman, Gerald Pinsky, Mordechai Hellman, Moshe Schreiber, Shalom Maidenbaum, Charles Silberberg, and Dekel LLC (the "<u>Cortland Creditors</u>").  Soon after discovering Barkany's fraud, the Cortland Creditors retained Locke Lord LLP as legal counsel, which in turn retained S. David Belsky, a Certified Public Accountant and Certified Financial Examiner, to further investigate Barkany's fraudulent activities.  On August 1, 2011, Barkany signed an affidavit of confession of judgment (the "<u>Affidavit of Confession</u>") whereby he stated, *inter alia*, that:

> (A) [he] repeatedly engaged in fraudulent and unauthorized practices and conveyances which victimized the [Cortland] Creditors.  [He] employed a variety of means in this fraud, including the solicitation of funds for real estate and loan transactions which, unbeknownst to [the Cortland Victims], were not as represented or altogether non-existent.
> (B) In each case, the [Cortland] Creditors provided funds for specific purposes and required repayment within a fixed and agreed period of time. . . .
> (C) The loans and real estate transactions were generally shams, fabricated by [him] to serve as a vehicle to separate [Cortland] Creditors from their money. . . .
> (D) While some of the earlier transactions did produce returns, when the transactions did not do so, [he] would resort to reporting fictitious or falsely inflated returns, making some payments and, on certain occasions, trying to get the creditors to roll over payments into new transactions. In reality, their money had been used to pay off other creditors or was otherwise

---

[2] The relevant facts are not in dispute, except as otherwise indicated.  The facts are taken from the pleadings, exhibits, transcripts, and other papers submitted by the parties in the bankruptcy case, including the Court's Claims Register.  The Court has taken judicial notice of the contents of the docket in this bankruptcy case.  <u>Teamsters Nat'l Freight Indus. Negotiating Comm. et al. v. Howard's Express, Inc. (In re Howard's Express, Inc.)</u>, 151 Fed. Appx. 46, 48 (2d Cir. 2005) (stating that courts are empowered to take judicial notice of public filings, including a court's docket); <u>Levine v. Egidi</u>, No. 93 C 188, 1993 WL 69146 (N.D. Ill. Mar. 8, 1993); <u>MedMal Trust Monitor v. VIII SV 5556 Lender, LLC (In re Saint Vincent's Catholic Med. Ctrs. of N.Y.)</u>, 440 B.R. 587, 599 (Bankr. S.D.N.Y. 2010) (taking judicial notice of the docket in the underlying bankruptcy case); <u>In re Campbell</u>, 500 B.R. 56, 59 n. 7 (Bankr. D.N.M. 2013) (electing to take judicial notice of the entire file in the case for sake of completeness as a bankruptcy court has the inherent authority to take judicial notice of entries on its own docket).  The Court is also permitted to take judicial notice of publicly-filed documents such as those filed on the dockets of other courts.  <u>Kavowras v. N.Y. Times Co.</u>, 328 F.3d 50, 57 (2d Cir. 2003) (noting that courts may take judicial notice of public filings); <u>Kramer v. Time Warner, Inc.</u>, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts … to establish the fact of such litigation and relating filings.") (internal citations omitted).

misappropriated by [him]. . . .

Affidavit of Confession, at 2-3.

Based upon the Affidavit of Confession, the Cortland Creditors obtained a prepetition judgment against Barkany on March 25, 2013 in the amount of $66,609,420.74 (the "Judgment"). [ECF No. 19-1]. On August 13, 2013, the Cortland Creditors entered into a partial satisfaction of the Judgment after recovering $10,066,000.00 and assigned the remaining $56,543,424.74 owed under the Judgment to Barkany Asset Recovery & Management LLC ("BARM", together with Cortland Realty Investments, LLC, Jordan Most, Marshal Eisenberg and Debra Eisenberg Wilder, Seth Farbman, Janet Pinsky, Shalom Maidenbaum, Rachell Gober, The Bosses' Daughter, LLC, Chaim Silberberg and Mr. San, LLC, the "BARM Group"). BARM was formed to collect and administer assets of Barkany by enforcing the Judgment and bringing claims against third parties. [ECF No. 19-2]. Mr. Belsky is the sole member and manager of BARM and Locke Lord LLP represents BARM as its legal counsel.

B.  The Second Investment Scheme.

In 2013, Barkany perpetrated a second investment scheme against, *inter alia*, the Canadian Northern Creditors by presenting himself as Gary Barr and causing the Canadian Northern Creditors to invest in excess of $8 million in purported real estate ventures. The Canadian Northern Creditors are represented by Joel S. Schneck, Esq., of Schachter Portnoy, L.L.C. in this bankruptcy case.

Having learned of Barkany's fraudulent activities, the Canadian Northern Creditors, with the exception of the Ludvik & Eva Hilman Family Partnership, L.P. (the "Family Partnership"), commenced an action in the Supreme Court of the State of New York ("New York State Supreme Court") against Barkany and other captioned *Canadian Northern Realty LLC, Canadian Northern Realty LLC on behalf of its members, Metro Equity Holdings, LLC, 169 16th Street LLC, Abraham Loffler, WLCF Metro Equity Holders, LLC, Law Offices of Allan Lebovits, as nominee, L'Chayim Foundation, Inc., David Weinberger and Refoel LeBracht v. Gershon Barkany a/k/a Gary Barr, Alan Gerson, Jason Rosenthal, Alfred Shonberger, Marina Development Company, LLC, Old World Investments, Sam Sprei, Jonathan Zelinger, Joseph Rosenberg, First American Title Insurance Corp., Bruce Montague & Partners and Morrison & Foerster*, Index No. 501806/2013 (the "Canadian Northern Lawsuit"). [Claims Register ECF No. 5-1, Ex. A].

3

According to the complaint filed in the Canadian Northern Lawsuit, Barkany and others allegedly working in conjunction with Barkany convinced 169 16th Street LLC to invest $500,000 with Barkany toward the purchase of property located at 105-107-111 West 28th Street, New York, New York, and $1,700,000 toward the purchase of 1 West 37th Street, New York, New York (the "37th Street Investment").  Barkany allegedly then approached the principal of 169 16th Street LLC, Abraham Loffler, about a third investment opportunity - the purchase of a building known as The Metro located at 301 West 53rd Street, New York, New York (the "Metro Deal") - for which he needed $7,500,000 as a soft deposit. After Loffler told his friend David Weinberger about the Metro Deal and of his previous investments with Barr, Weinberger agreed to put together several investors for the Metro Deal.  Loffler and Weinberger thereafter formed Metro Equity Holdings, whose members are WLCF Metro Equity Holdings LLC and WL Metro Holdings LLC.  To facilitate the Metro Deal, Barkany formed Canadian Northern Realty LLC whose members consist of Metro Equity Holdings, with a 64% ownership interest, Gary Barr (i.e., Barkany), with a 17.5% ownership interest, and Yehudah (Jacob) Stolzberg, with a 17.5% interest.  Barkany allegedly told Loffler to pay $2,000,000 to Alfred and Judith Schonberger and represented that the Schonbergers had advanced $2,000,000 that was used as the initial deposit on the Metro Deal.

The plaintiffs further allege that in February of 2013, Loffler arranged for two cashier checks aggregating $2,000,000 to be issued from the 169 16th Street LLC bank account and delivered to the Schonbergers.  The Schonbergers deposited the checks but did not fund the deposit for the Metro Deal.  Barkany directed that the remaining $5,500,000 be wired into a TD bank account under the name of First American Title Insurance Corp. and represented that the funds would be held in escrow.  Barkany provided the plaintiffs in the Canadian Northern Lawsuit with an escrow agreement between Canadian Northern Realty LLC and First American Title Insurance Corp. that provided that the escrow funds would not be released absent direction from Canadian Northern Realty LLC. Barkany represented that the First American Title Insurance Company would be issuing title insurance for the Metro Deal but in reality, First American Title Insurance Company, a bona fide title insurance company, was not involved with the transaction.  Rather, First American Title Insurance Corp. was an entity created by Barkany allegedly to mislead investors into believing that a reputable title insurance company was participating in the deal. The $5,500,000 deposit was immediately withdrawn by Barkany or others allegedly acting with him or on his

4

behalf and distributed to the other defendants in the Canadian Northern Lawsuit, and the TD Bank account was closed within a few days of the monies being deposited into the account. The Canadian Northern Lawsuit seeks recovery of $7.5 million under theories of conversion, fraudulent conveyances under New York Debtor and Creditor Law §§ 273, 275, 276, and 276(a), and unjust enrichment.

In addition, plaintiffs also raised a separate cause of action against Alan Gerson, Esq. ("Gerson") and his law firm, Bruce Montague & Partners (the "Montague Firm"), for aiding and abetting fraud. Loffler had asked Gerson about Barr's character and honesty and whether he should participate in the 37th Street Investment and Gerson allegedly told Loffler that Barr was honest and reputable, that the 37th Street Investment should go smoothly and that Gerson would be the transactional attorney for the 37th Street Investment. Plaintiffs allege that Gerson and the Montague Firm had a duty to tell the truth about Barr when asked by Loffler in a transaction in which they were acting as legal counsel, that their misrepresentations provided substantial assistance to Barkany in defrauding the plaintiffs, and they aided and abetted Barkany in his fraudulent activities which caused damages to the plaintiffs in the sum of $7,500,000.

The Family Partnership commenced its own prepetition lawsuit in New York State Supreme Court against Barkany and other third parties captioned *Ludvik and Eva Hilman Family Partnership, L.P. v. Alan Gerson, Esq., Bruce Montague & Partners, and Gershon Barkany*, Index No. 502113/2013 (the "FP Lawsuit") [ECF No. 271]. According to the complaint filed in the FP Lawsuit, Gerson (i) introduced the Family Partnership to Barkany as a real estate investor named Gary Barr, (ii) withheld Barr's true identity to prevent the Family Partnership from identifying Barr as Barkany and that Gerson and the Montague Firm knew of Barkany's disreputable past, and (iii) represented that he and/or the Montague Firm had represented Barr in past real estate transactions and that with the exception of one bad investment due to the economy, Barr's real estate investments were profitable. The Family Partnership allegedly retained Gerson to represent its interests in investing in a parcel of real estate located at 103 West 28th Street, New York, New York (the "103 West 28th Street Investment") proposed by Barkany. On March 16, 2013, the Family Partnership wired $750,000 (the "FP Funds") into Gerson's IOLA Trust account to be held in escrow for the sole purpose of facilitating the 103 West 28th Street Investment. The Family Partnership alleges that Gerson, without authorization, dispersed the FP Funds to various

5

parties, including Barkany, and used some of the FP Funds for his own personal expenses and those of the Montague Firm.  The Family Partnership subsequently learned that the 103 West 28th Street Investment never existed and was part of Barkany's investment scam.  The Family Partnership then commenced the FP Lawsuit seeking, *inter alia*, a recovery of the FP Funds from the defendants with respect to the fraudulent investment scheme and from Gerson on the basis that he converted and misappropriated the FP Funds and the defendants were unjustly enriched as a result.

C.   Criminal Proceedings.

On March 27, 2013, two days after the Cortland Creditors obtained their Judgment against Barkany, the United States Attorney's Office for the Eastern District of New York filed a Complaint and Affidavit in Support of Arrest Warrant against Barkany in the U.S. District Court captioned, United States of America v. Barkany, No. 13-CR-0362 (LDW) (ARL) [No. 13-CR-0362, ECF No. 1].  On June 25, 2013, an Information was filed against Barkany charging him with wire fraud and the U.S. Attorney's Office sought a criminal forfeiture action against Barkany's assets.  [No. 13-CR-0362, ECF No. 34].  The Information alleged that Barkany devised, implemented, supervised and executed a scheme to fraudulently induce investors to give him and certain Barkany entities monies supposedly for the purchase of real estate that he would subsequently sell for a profit.  He assured investors that the real estate deals would be "risk free".  Instead of using the investors' monies to purchase real estate, Barkany used the funds to pay other investors, donated it to charity, lost it gambling in Atlantic City, and otherwise used it for his own benefit.  The fraudulent scheme affected interstate commerce because several wire transfers traveled across state lines through the Federal Reserve Wire Network.  The day after the Information was filed, Barkany plead guilty to wire fraud before Magistrate Judge Lindsay [No. 13-CR-0362, ECF No. 44], and on August 7, 2013, District Judge Wexler approved Barkany's guilty plea.  [No. 13-CR-0362, ECF No. 46].  Barkany is currently awaiting sentencing on the criminal charges.

D.   BARM's Investigation.

In the meantime, according to BARM, Mr. Belsky's investigation revealed that, *inter alia*, Joseph Rosenberg (Barkany's father-in-law), Saul Kessler, and the Marina District Development Company, LLC a/k/a the Borgata Hotel Casino and Spa (the "Borgata"), received over $10,000,000 from Barkany's fraudulent

investment schemes. In an effort to collect on its Judgement, BARM commenced separate prepetition fraudulent conveyance actions against Mr. Rosenberg on March, 4, 2014,[3] the Borgata on April 23, 2014,[4] and Mr. Kessler on April 29, 2014[5] (collectively referred to as the "BARM Prepetition Fraudulent Conveyance Actions"). Mr. Rosenberg, as well as other recipients of alleged fraudulent conveyances, i.e., Jonathan Zelinger, Ethical Products, Inc., and Petex International Limited ("Petex"), are represented by Lester Kirschenbaum, Esq. of Kaye Scholer LLP ("Kaye Scholer") in this bankruptcy case. Mr. Zelinger is the president of Ethical Products, Inc. and the chairman of Petex. He is also the brother of Barkany's mother-in-law (i.e., the brother of Mr. Rosenberg's wife).[6] Mr. Rosenberg, Mr. Zelinger, Ethical Products, Inc. and Petex are referenced collectively as the "Rosenberg Group". Kaye Scholer also represented Mr. Kessler in this bankruptcy case until February 23, 2015 when Robert J. Spence, Esq. of the Spence Law Office P.C. filed a notice of appearance on behalf of Mr. Kessler.

On June 19, 2014, Mr. Kessler filed a third party complaint against Barkany in the BARM Prepetition Fraudulent Conveyance Action commenced against him. In the third-party action, Mr. Kessler asserts a claim for indemnification and contribution from Barkany to the extent he is found liable to BARM. However, service of the third party summons and complaint was void. [Index No. 154149/2014, Doc. No. 27]. Similarly, on June 20, 2014, the members of the Rosenberg Group filed a third party complaint against Barkany in the BARM Prepetition Fraudulent Conveyance Action commenced against them seeking indemnification and contribution from Barkany for any liability they may have to BARM.

II.    The Bankruptcy Proceedings.

    A.    The Bankruptcy Filing and Events Leading Up to the Election Controversy.

    On June 25, 2014, a few days after Mr. Kessler and the Rosenberg Group filed their third party complaints against Barkany in the BARM Prepetition Fraudulent Conveyance Actions, Messrs. Rosenberg and

---

[3] See Barkany Asset Recovery and Management LLC vs. Rosenberg, et al., Index No. 650714/2014 (N.Y. Sup. Ct.).

[4] See Barkany Asset Recovery Management LLC v. Marina District Development Co., LLC, No. 1:14-cv-02602 (E.D.N.Y.).

[5] See Barkany Asset Recovery Management LLC v. Kessler, et al., Index No. 154149/2014 (N.Y. Sup. Ct.).

[6] Nov. 13, 2014 Hr'g Tr. 13:3-4 [ECF No. 82]. As used herein, "[Date] Hr'g Tr." refers to the transcript of a hearing before the Court on the date indicated.

Kessler and the Borgata (the "Petitioning Creditors") filed an involuntary chapter 7 bankruptcy petition against Barkany. [ECF. No. 1]. As a result of the involuntary bankruptcy filing, the BARM Prepetition Fraudulent Conveyance Actions with respect to the Petitioning Creditors were stayed.[7] Barkany and BARM each filed a motion to dismiss and vigorously contested the involuntary petition for more than six months before Barkany ultimately consented to the chapter 7 filing. An order for relief ("Order for Relief") was entered on January 14, 2015. [ECF No. 118]. The Order for Relief directed the Debtor to file his list of creditors within seven days, and his bankruptcy schedules and statement of financial affairs within fourteen days. Should the Debtor fail to file the required bankruptcy documents, the Order for Relief directed the Petitioning Creditors to file these documents pursuant to Bankruptcy Rule 1007(k) [8] within twenty-one days. Thereafter, Marc A. Pergament, Esq., one of the attorneys on the panel of chapter 7 trustees in this district, was appointed as the interim trustee on January 22, 2015. [ECF No. 120]. The initial meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "341 Meeting") was scheduled for March 11, 2015, notice of which was sent by the Clerk's Office on February 4, 2015. [ECF No. 136].

On the same day the notice of the initial 341 Meeting was issued, Mr. Kirschenbaum, as counsel for Mr. Rosenberg, filed the Debtor's bankruptcy schedules and statement of financial affairs. [ECF No. 128]. Pursuant to the schedules of creditors filed, the claim of Canadian Northern Realty is listed as "disputed" as are the claims of each of the Canadian Northern Creditors with the exception of (i) Metro Equity Holdings LLC, which is listed as undisputed, and (ii) the Family Partnership, which is not listed as a creditor. In his Declaration Concerning Debtor's Schedules of Counsel for Petitioning Creditor Joseph Rosenberg filed with the bankruptcy schedules [ECF No. 128], Mr. Kirschenbaum submits that the information contained in the Debtor's schedules is not based upon his personal knowledge and that in compiling the schedules he has "not performed any due diligence with

---

[7] While the BARM Prepetition Fraudulent Conveyance Action against Mr. Rosenberg is listed as active on the state court docket, this action was stayed under section 362(a) of the Bankruptcy by virtue of Mr. Rosenberg's filing of a third party complaint against Barkany just prior to the involuntary bankruptcy filing.

[8] Bankruptcy Rule 1007(k) provides that "[i]f a list, schedule, or statement…is not prepared and filed as required by this rule, the court may order…a petitioning creditor…to prepare and file any of these papers within a time fixed by the court."

respect to the information set forth in the Debtor's schedules, and express[es] no opinion on the accuracy or completeness of the same."  Rather, Mr. Kirschenbaum declares that the schedules were based upon, *inter alia*, his review of court pleadings, transcripts of hearings, depositions, and documents relating to those pleadings, and communications he and others at his firm had with the Debtor and the Debtor's counsel.  Mr. Kirschenbaum filed an amended schedule F (Creditors Holding Unsecured Nonpriority Claims) on February 9, 2015 to add two additional creditors and again declared that he has not performed any due diligence with respect to the information set forth in Schedule F and he expresses no opinion on the accuracy or completeness of amended Schedule F.  [ECF No. 138].

On March 10, 2015, BARM filed Proof of Claim No. 7 against the Debtor in the amount of $51,221,629.10, which was based upon the Judgment, plus interest and less any recoveries already received.  Other members of the BARM Group filed their own proofs of claim against the estate totaling $48,626,589.85.

One March 10, 2015, four of the members of the Canadian Northern Creditors filed proofs of claim against the Debtor.  169 16th Street, LLC filed Claim 8-1 in the general unsecured amount of $4,000,000.  WL Metro Equity Holdings, LLC filed Claim 9-1 in the general unsecured amount of $1,750,000.  L'Chayim Foundation, Inc. filed Claim 10-1 in the general unsecured amount of $1,400,000.  The Family Partnership filed Claim No. 11 in the general unsecured amount of $750,000.[9]  On April 20, 2015, the Law Offices of Allan Lebovits, P.C., filed Claim No. 22-1 in the general unsecured amount of $350,000.  Thus, the claims of the Canadian Northern Creditors total $8,250,000.00.

B.   The Election Controversy.

On March 10, 2015, Locke Lord LLP contacted the Office of the United States Trustee ("U.S. Trustee") and the interim trustee to notify them that the BARM Group and the Canadian Northern Creditors will request an election for the permanent trustee at the initial 341 Meeting to be held the next day.  [ECF No. 151].  Then, for reasons unknown to this Court, Kaye Scholer, as counsel for the Rosenberg Group, received notice of this

---

[9] The Family Partnership filed an amended proof of claim on March 25, 2015 in the same amount as its original claim, except it attached a copy of the $750,000 wire transfer made to Gerson's account in support of its claim. (Claim No. 11-2).

communication.  In response, later in the day on March 10, 2015, Kaye Scholer sent an email to the U.S. Trustee seeking an adjournment of the 341 Meeting for a minimum of forty-five days, for the purpose of allowing its clients to "request the opportunity to consult with other creditors to determine whether a consensus candidate can be identified, or alternatively to put up their own candidate for trustee."  [ECF No. 151].

At the commencement of the 341 Meeting on March 11, 2015, Christine H. Black, Esq., Assistant U.S. Trustee, appeared on behalf of the U.S. Trustee and notified those present that the 341 Meeting would not go forward because the BARM Group and the Canadian Northern Creditors planned to call for an election of a permanent trustee, and because the U.S. Trustee needed additional time to perform administrative functions in preparation for such an election.  As a result, the 341 Meeting was rescheduled for April 22, 2015.

On April 21, 2015, the day before the rescheduled 341 Meeting, the Rosenberg Group filed objections to the proofs of claim filed by the BARM Group. [ECF No. 176].  On the same date, Kaye Scholer on behalf of the Rosenberg Group emailed a letter to the U.S. Trustee (the "April 21 Letter") [ECF No. 189-9] objecting to eligibility of the Canadian Northern Creditors and the BARM Group to vote at a trustee election.[10]  In the April 21 Letter, the Rosenberg Group contended that all five members of the Canadian Northern Creditors were ineligible to vote because they each allegedly held an interest materially adverse to other creditors entitled to a distribution in this bankruptcy case as prohibited by section 702(a)(2) of the Bankruptcy Code.  The basis for the Rosenberg Group's objection to the eligibility of the Canadian Northern Creditors to vote is two-fold. First, the Rosenberg Group argues that by pursuing the Canadian Northern Lawsuit, the Canadian Northern Creditors were seeking to recover funds from various transferees of the Debtor for their own benefit to the exclusion of the Debtor's other creditors.  Second, the Rosenberg Group alleged that, upon information and belief, the Canadian Northern Creditors have entered into an agreement with BARM and/or all of the other members of the BARM Group under

---

[10] In its April 21 Letter, the Rosenberg Group argued that the proofs of claim filed by the BARM Group are the subject of an omnibus claim objection that will be filed later that day and alleges that the BARM Group is ineligible to vote at a trustee election because (i) the BARM Group objected to the interim trustee's motion to substantively consolidate the various legal entities allegedly controlled by the Debtor, (ii) BARM, as agent for, and acting for the benefit of, its members, has received avoidable transfers and upon information and belief, refuses to turn over those assets to the interim trustee, and (iii) BARM should be viewed as an insider because BARM has been in possession and control of all of the Debtor's assets since 2011. Because this Memorandum Decision and Order addresses only the motion of the Canadian Northern Creditors to resolve the election controversy, the Court will not discuss the eligibility of the BARM Group to vote in an election, but simply notes the objection to the BARM Group's eligibility raised by the Rosenberg Group in its April 21 Letter.

which the Canadian Northern Creditors will receive a portion of the proceeds generated by BARM through the liquidation of the Debtor's assets.[11] [ECF No. 187-9]. The Rosenberg Group, however, did not file any objection to the proofs of claim filed by any of the Canadian Northern Creditors.

On April 22, 2015, the U.S. Trustee held the rescheduled 341 Meeting and Mr. Kirschenbaum, on behalf of the Rosenberg Group, again objected to the eligibility of the Canadian Northern Creditors to vote. In so doing, he referenced the written objection set forth in the April 21 Letter, stating that, "in our (April 21) letter we noted our grounds for objecting to all creditors represented by Mr. Schneck … the Schneck group of creditors we refer to as the Canadian Northern Creditors." [341 Meeting Audio Tr., beginning at the 13:00 minute mark].[12] After Mr. Kirschenbaum stated his objection for the record, the U.S. Trustee conducted the election requested by the BARM Group and the Canadian Northern Creditors. The BARM Group and all five members of the Canadian Northern Creditors, including the Family Partnership, voted for Mark A. Frankel, Esq., of Backenroth Frankel & Krinsky, LLP. Mr. Kessler and other creditors known as the Whitefish Creditors,[13] with the exception of one of its members, the Whitefish Group, LLC who did not file a proof of claim, voted for Mr. Pergament. The members of the Rosenberg Group could not vote either because they were insiders, held contingent claims or their claims were disputed.[14]

---

[11] Mr. Kirschenbaum's April 21 Letter specifically states that:

> [t]he Canadian Northern Creditors are also ineligible to vote in a trustee election because they have interests materially adverse to the other unsecured creditors in this case. First, the Canadian Northern Creditors filed a pre-petition complaint against the Debtor and various other parties in an action captioned Canadian Northern Realty LLC v. Barkany (N.Y. Sup.Ct. Index No. 501806/2013) (the 'Canadian Northern Lawsuit'). In that case, among other things, the Canadian Northern Creditors have asserted claims against various transferees of funds from the Debtor to recover those funds for themselves (to the exclusion of the Debtor's other creditors) on a constructive trust type theory.

> Second, upon information and belief, the Canadian Northern Creditors have entered into an agreement with BARM and/or all of the other BARM Creditors under which the Canadian Northern Creditors will receive a portion of the proceeds generated by BARM through the liquidation of the Debtor's assets which BARM refuses to turn over to the interim trustee. Therefore, just as the BARM Creditors are ineligible to vote because they hold an interest materially adverse to the other creditors entitled to a distribution in this case, so too the Canadian Northern Creditors are ineligible to vote.

[12] A transcript for the 341 Meeting is not available on the Court's docket but Court was able to obtain a copy of the audio recording.

[13] The Whitefish Creditors consists of Murray Leifer, Sarah Leifer, Jonathan Leifer, Edward Lowy and Whitefish Group, LLC.

[14] 11 U.S.C. § 702(a)(1) and (3). The March 10, 2015 email communication by counsel for the Rosenberg Group to the U.S. Trustee seeking an adjournment of the 341 Meeting in order to allow its clients to "request the opportunity to consult with other creditors to

C.   Motions to Resolve the Election Controversy.

On May 1, 2015, the U.S. Trustee filed a Report of the Debtor's Chapter 7 Election Controversy (the "Election Report") [ECF No. 187] in accordance with Bankruptcy Rule 2003(d)(2),[15] and explained that "all of the claims that sought to vote in the election are subject to one or more objection."  Election Report, at 36.  The U.S. Trustee raised the issue of whether Schedule F should be utilized in tabulating the votes because Schedule F was not authenticated by the Debtor and the BARM Group has objected to the use of Schedule F for this purpose. In conclusion, the U.S. Trustee could not determine whether the twenty percent threshold of eligible claims required under section 702 of Bankruptcy Code to request and vote at a trustee election had been met, and was unable to certify the election.  Furthermore, in the Election Report, the U.S. Trustee stated that on April 23, 2015, the day after the election was conducted, Mr. Pergament sent a letter by email and regular mail to Ms. Black alleging that Mr. Frankel was ineligible to serve as permanent trustee because his law firm had represented an individual that owed money to the Debtor.

On May 15, 2015, the Canadian Northern Creditors and the BARM Group filed separate motions to resolve the election controversy in favor of Mr. Frankel in accordance with Bankruptcy Rule 2003(d)(2).[16] [ECF Nos. 199 and 200]. In its motion, the BARM Group argued, *inter alia*, that (i) notwithstanding the U.S. Trustee's failure to tabulate potential alternatives, the BARM Group and/or the Canadian Northern Creditors are eligible to vote under section 702(a) of the Bankruptcy Code and (ii) despite the objections raised by the Rosenberg Group, neither its members nor the Canadian Northern Creditors hold any interest materially adverse to other creditors. [ECF No. 199-2].  The BARM Group also challenged the failure of Mr. Pergament or the U.S. Trustee, to the extent the U.S. Trustee was aware of a potential issue regarding Mr. Frankel's candidacy prior to the 341 Meeting, to question Mr. Frankel's disinterestedness at the election so that it could be addressed at that time.  The

---

determine whether a consensus candidate can be identified, or alternatively to put up their own candidate for trustee" is puzzling since the members of the Rosenberg Group are ineligible to vote at a trustee election pursuant to section 702(a) of the Bankruptcy Code.

[15] Bankruptcy Rule 2003(d)(2) governs the reports of disputed elections, and provides that, "[i]f the election is disputed, the United States trustee shall promptly file a report stating that the election is disputed…"

[16] Bankruptcy Rule 2003(d)(2) requires that any party seeking to resolve an election controversy must file a motion "no later than 14 days after the United States trustee files a report of a disputed election…."

BARM Group asserted that Mr. Frankel's firm represented Stephen Jemal ("Jemal"), the owner of SSJ Development, LLC ("SSJ Development"), and that Mr. Pergament's conflict of interest argument fails because it rests on two faulty assumptions – first, that the Debtor made a loan to SSJ Development, and second, that Jemal owed money to the Debtor. According to the BARM Group, the assumptions are incorrect because Pratt Foreclosures, LLC ("Pratt"), in which the Debtor owned a one-half interest, made the loan to SSJ Development in 2008, and therefore, the lender was Pratt and not the Debtor, and the borrower was SSJ Development and not Jemal. Further, while Jemal did provide a guaranty of the Pratt loan to SSJ Development, his liability under the guaranty was discharged in his personal bankruptcy case on November 2, 2012.

In its motion to resolve the election controversy, the Canadian Northern Creditors asserted that (i) they met the eligibility requirements of section 702(a) of the Bankruptcy Code and (ii) while they may have claims against creditors of the bankruptcy estate, a recovery on such claims would not reduce the size of the estate or the amount available for distribution to creditors. The Canadian Northern Creditors also stated that no agreement exists between them and the BARM Group to share in the recovery of the Debtor's assets and that the Rosenberg Group's objection was based upon mere suspicion. [ECF No. 200-1, at 4].

The Rosenberg Group filed an objection to the motions on May 22, 2015 (the "May 22 Objection"), reiterating the same two grounds set forth in its April 21 Letter to the voting eligibility of the Canadian Northern Creditors. [ECF No. 202]. The Whitefish Creditors filed a joinder to the Rosenberg Group's arguments. [ECF No. 203]. Alfred Schonberger, who is a defendant in the Canadian Northern Lawsuit, and Mordechai Shulman who is a defendant in one of BARM's prepetition lawsuits, also filed a joinder to the Rosenberg Group's May 22 Objection. [ECF No. 207]. Mr. Kessler filed an objection (the "Kessler Objection") on May 22, 2015 [ECF No. 205] to the motions contending that the BARM Group and the Canadian Northern Creditors are ineligible to vote at a trustee election because they had commenced legal proceedings against other alleged victims and creditors of Barkany. According to Mr. Kessler, these proceedings include the Canadian Northern Lawsuit and an action by Metro Equity Holdings LLC individually and as a member of Canadian Northern Realty LLC against Morrison &

Foerster LLP, et. al., Index No. 500660/2015 (the "Morrison & Foerster Lawsuit").[17]  The Kessler Objection also

asserts generally with respect to the Canadian Northern Creditors that they "have filed two pre-bankruptcy actions

against the non-moving parties and none against the BARM [Group].  They are therefore adverse to the non-

moving parties."  Kessler Objection, at 5.  However, Mr. Kessler did not identify the pre-bankruptcy actions nor

articulate how these two pre-bankruptcy actions against the non-moving parties rendered the Canadian Northern

Creditors with an interest materially adverse to other creditors.[18]  On May 22, 2015, Mr. Pergament filed a

response to the motions to resolve the election controversy objecting to the BARM Group's eligibility to vote at

the trustee election and asserting again that Mr. Frankel has a conflict of interest that would preclude his

appointment as the permanent trustee. [ECF No. 206].  In his response, Mr. Pergament did not set forth any basis

for Canadian Northern Creditors' ineligibility to vote in an election other than to allege that they were ineligible.

On May 29, 2015, the Canadian Northern Creditors and the BARM Group each replied to the Rosenberg

Group's May 22 Objection, insisting once more that no agreement ever existed between the two groups. [ECF

Nos. 213 and 214].

On June 2, 2015, the Court held a hearing (the "June 2 Hearing") on the motions to resolve the election

controversy.  At the June 2 Hearing, the Rosenberg Group again voiced its objection to the voting eligibility of the

Canadian Northern Creditors on the same two grounds set forth in its April 21 Letter, and which it had reiterated

at the 341 Meeting and in its May 22 Objection.  The Rosenberg Group also made it perfectly clear that it was not

objecting to the proofs of claims filed by any of the Canadian Northern Creditors, and that its only objection was

premised on the Canadian Northern Creditors holding an interest materially adverse to the bankruptcy estate

under section 702(a)(2) of the Bankruptcy Code as set forth in the April 21 Letter. June 2 Hr'g Tr. 39:23-40:3

[ECF No. 226].  Specifically, Mr. Kirschenbaum represented to the Court that, "I have no knowledge of any basis

---

[17] The Morrison & Foerster Lawsuit was commenced postpetition in 2015. Kessler Objection, at 3.

[18] At the evidentiary hearing held before the Court on August 11, 2015, Mr. Kessler represented that the two lawsuits mentioned in the Kessler Objection refer to the Canadian Northern Lawsuit and a separate lawsuit against Morrison & Foerster.  Aug. 11 Evidentiary Hr'g Tr. 21:23-22:3.  [ECF No. 266].

as we stand here today to [object][19] to their claims and I would never file a claim objection." June 2 Hr'g Tr. 40:1-3.

At the June 2 Hearing, after consideration of the parties' submissions and the arguments of counsel, the Court noted that section 702 of the Bankruptcy Code does not expressly require that an elected chapter 7 trustee be disinterested. Accordingly, the Court advised the parties that before considering the merits of the motions to resolve the contested election, the Court would first consider whether an election candidate must be disinterested, and if so, whether Mr. Frankel is a disinterested person and may serve as the permanent trustee if he receives the requisite votes. Moreover, Mr. Frankel was the only person other than Mr. Pergament to receive a vote at the election. If a permanent trustee was required to be disinterested and Mr. Frankel did not satisfy this requirement, then the election controversy would be resolved and Mr. Pergament would remain the chapter 7 trustee. Therefore, the Court (a) directed the parties to submit legal memoranda on the following issues: 1) whether a permanent trustee was required to be disinterested under section 702 of the Bankruptcy Code and 2) if there is a disinterested requirement, whether Mr. Frankel satisfies this requirement, and (b) scheduled a hearing for June 23, 2015. At the June 23, 2015 hearing, Mr. Pergament requested that the issue of disinterestedness be set down for an evidentiary hearing, which the Court scheduled for July 13, 2015 ("July 13 Hearing").

On the basis of the testimony and evidence received at the July 13 Hearing, the arguments of counsel, and the papers submitted, the Court concluded that (i) a permanent trustee elected under section 702 of the Bankruptcy Code must be a disinterested person, and (ii) at least insofar as the parties and issues appear in this case at the present time, Mr. Frankel was disinterested and free of any disabling conflict of interest.[20]

Having thus ruled that Mr. Frankel may serve as permanent trustee should he receive the requisite votes, the Court turned to the next phase in the election controversy, voting eligibility. To conserve judicial resources and the resources of the parties in adjudicating the contested election, the Court determined that bifurcation of the central issue of eligibility was warranted because, based upon the amount of the claims of those voting at the 341

---

[19] The June 2 Hearing transcript contains a transcription error in that Mr. Kirschenbaum's representation to the Court and those present was "object" as opposed to "reject" as reflected in the transcript.

[20] The Court's findings of facts and conclusions of law regarding Mr. Frankel's disinterestedness are memorialized in a separate decision issued concurrently with this Memorandum Decision and Order.

15

Meeting, if either the BARM Group or the Canadian Northern Creditors were considered eligible to vote at the election, then the election controversy would be resolved in favor of Mr. Frankel.  As such, since the objections to the Canadian Northern Creditors' eligibility were much less complex than those raised in relation to the BARM Group, the Court scheduled an evidentiary hearing on August 11, 2015 (the "Aug. 11 Evidentiary Hearing") to consider the eligibility of any or all of the Canadian Northern Creditors to call for and vote in an election under section 702 of the Bankruptcy Code.

Shortly after the July 13 Hearing, Mr. Pergament submitted an unprompted letter to the Court requesting an opportunity to conduct discovery prior to arguing any other issues relating to the voting eligibility of the BARM Group and the Canadian Northern Creditors. [ECF No. 248].   In response to this letter, the BARM Group and the Canadian Northern Creditors submitted letters objecting to any form of discovery.  [ECF Nos. 249 and 250].  The BARM Group and Canadian Northern Creditors argued that they had previously represented to the Court that no agreement between the parties existed and Mr. Pergament has not alleged that any Canadian Northern Creditor has received a preferential payment.  Therefore, they asserted that the only possible remaining basis to disqualify the votes of the Canadian Northern Creditors would be a meritorious objection to their proofs of claims, but Mr. Pergament had not objected to these claims and the Rosenberg Group has acknowledged that it knows of no basis to object to such claims.  The Rosenberg Group filed a letter on July 16, 2015 ("July 16 Reply Letter") arguing that (a) there are at least two grounds to support a determination that the Canadian Northern Creditors have an interest materially adverse to other creditors: 1) the prepetition litigation to recover alleged fraudulent conveyances made to various third party transferees (i.e., the Canadian Northern Lawsuit), and 2) unlike its earlier insistence of the existence of an agreement between the BARM Group and the Canadian Northern Creditors in the April 21 Letter, it now posited that "there may be some type of arrangement between these groups with respect to the sharing of proceeds which they recover", and (b) Mr. Pergament and the Rosenberg Group are entitled to take discovery with respect to both these subjects.  [ECF No. 251].  Based upon these unprompted letters submitted to the Court, the Court scheduled a status conference for July 23, 2015 regarding the request for discovery.

16

At the July 23, 2015 status conference (the "July 23 Conference"), the Court recited the timeline of the Rosenberg Group's objections to the eligibility of the BARM Group and the Canadian Northern Creditors to vote at a trustee election and the basis of those objections. The Court reminded the parties that with respect to the Canadian Northern Creditors, the Rosenberg Group's May 22 Objection and April 21 Letter raised "two reasons *and two reasons only* that the Canadian Northern Creditors should not be entitled to vote…." (Emphasis added.) July 23 Conference Tr. 22:19-23:12 [ECF No. 269]. These reasons were (i) the pre-petition Canadian Northern Lawsuit and (ii) the alleged agreement or arrangement between the BARM Group and the Canadian Northern Creditors. Based upon its determination at the July 13 Hearing, the Court scheduled the Aug. 11 Evidentiary Hearing to determine the voting eligibility of the Canadian Northern Creditors and made clear at the July 23 Conference that based upon the objection lodged by the Rosenberg Group in the April 21 Letter these were the only two grounds to be addressed at the Aug. 11 Evidentiary Hearing. The Court determined that there was no need for Mr. Pergament and the Rosenberg Group to take discovery because (a) each of the Canadian Northern Creditors may file a declaration under penalty of perjury or an affidavit as to whether or not an agreement exists between them and the BARM Group regarding distribution of the Debtor's assets, and opposing parties would be given the opportunity to cross-examine the declarants, and (b) the parties need only look to the allegations raised in the Canadian Northern Lawsuit since the filing of the Canadian Northern Lawsuit and the recovery sought are what created the interest that purportedly is materially adverse on the part of the Canadian Northern Creditors.

At the start of the Aug. 11 Evidentiary Hearing, the Court again reminded the parties that the only two issues to be considered were those raised in the April 21 Letter. Despite the Court's directive, the Rosenberg Group, for the first time asserted that the FP Lawsuit establishes a separate basis for disqualifying the Family Partnership from voting in the trustee election. The Rosenberg Group, while aware of the FP Lawsuit, never raised it at or before the election, or in any prior pleading or hearing concerning the disputed election. Counsel for the Rosenberg Group, however, affirmatively represented that although it "inadvertently" omitted any prior

reference to the FP Lawsuit,[21] it did object generally to the eligibility of the Family Partnership not only in its April 21 Letter but also at the 341 Meeting.[22]  Counsel's representation, however, is contradicted by the very language of the April 21 Letter.  The April 21 Letter makes no mention of the FP Lawsuit either specifically or generally.  The only ground the Court can extract from the Rosenberg Group's objection in the April 21 Letter is that the Family Partnership is ineligible to vote because it allegedly has an agreement with the BARM Group, and thus it has an interest materially adverse to other creditors of the estate.

At the conclusion of the Aug. 11 Evidentiary Hearing, the Court directed the parties to file post-hearing briefs on the voting eligibility of the Family Partnership so as to allow the Canadian Northern Creditors an opportunity to fully respond to the Rosenberg Group's new allegation regarding the FP Lawsuit.  However, after due deliberation, the Court concluded that at the Aug. 11 Evidentiary Hearing, the parties had extensively argued the Rosenberg Group's objection based on the FP Lawsuit and the issue of whether the Canadian Northern Creditors are eligible to vote.  The only matter the Court needed to confirm was counsel's representation that the Rosenberg Group raised an objection regarding the FP Lawsuit at the 341 Meeting.  Therefore, the Court entered an order on August 12, 2015 (the "August 12 Order") limiting the post-hearing submissions, *inter alia*, to identifying portions of the 341 Meeting transcript and the U.S. Trustee's Election Report that reference the Rosenberg Group's objection to the eligibility of the Family Partnership to vote for a permanent trustee by reason of the FP lawsuit.  [ECF No. 265].

On August 21, 2015, contrary to the August 12 Order, the Rosenberg Group submitted a post-hearing statement in which it further briefed the issue as to why the Family Partnership was ineligible to vote. [ECF No. 270].  As a consequence of failing to act in accordance with the August 12 Order, this Court will only address the statements in the Rosenberg Group's post-hearing submission that are permitted by the August 12 Order.  Thus, the Rosenberg Group's statement that "there was not any reference to the Family Partnership Litigation" at the

---

[21] At the Aug. 11 Evidentiary Hearing, Mr. Kirschenbaum, counsel for the Rosenberg Group, repeatedly conceded that he made a "mistake" and inadvertently failed to include any mention of the FP Lawsuit. See Aug. 11 Evidentiary Hr'g Tr. 15:25-16:1; 18:14-16; 19:2-5, 26:2-19, and 35:11.

[22] Aug. 11 Evidentiary Hr'g Tr. 25:9-15.

341 Meeting is the only portion of the pleading which can be considered. [ECF No. 270, at 6 n. 3].  The remainder of the Rosenberg Group's post-hearing statement essentially repeats the arguments it raised at the Aug. 11 Evidentiary Hearing.  On August 21, 2015, the Canadian Northern Creditors also submitted a post-hearing statement contending that, upon their review of the 341 Meeting transcript and the U.S. Trustee's Election Report, the Rosenberg Group did not make any reference to the FP Lawsuit. [ECF No. 272].  Therefore, the Rosenberg Group's assertion that it previously raised an objection to the Family Partnership's eligibility based upon the FP Lawsuit prior to or at the rescheduled 341 Meeting is inaccurate.

In addition, the Canadian Northern Creditors informed the Court and the parties in their post-hearing statement that the Canadian Northern Lawsuit had been dismissed by the state court prior to the filing of the involuntary bankruptcy petition due to failure by the Canadian Northern Creditors to appear at a status conference.  A review of the state court docket for the Canadian Northern Lawsuit shows that no substantive activity occurred at or around the time the involuntary petition was filed against Barkany, i.e., June 25, 2014.  The last hearing held before the state court was on May 1, 2014 at which none of the parties appeared and the case was marked off the state court's trial calendar.  Although the docket does not reflect that the case has been administratively closed, any motions filed in the Canadian Northern Lawsuit appear to have been held in abeyance or consistently adjourned since May 1, 2014.  Furthermore, counsel for Mr. Schonberger, one of the defendants, filed a notice of bankruptcy on the state court docket stating that bankruptcy proceedings relating to Barkany have been commenced and asserting that the bankruptcy stayed all proceedings in the Canadian Northern Lawsuit.  There has been no document filed with the state court contesting the bankruptcy stay notice.  Therefore, it appears that the Canadian Northern Lawsuit has, in essence, been placed on administrative hold.

<u>DISCUSSION</u>

I.      Chapter 7 Trustee Elections Generally.

Under chapter 7 of the Bankruptcy Code, a trustee is appointed on an interim basis after an order for relief has been entered.  11 U.S.C. § 701(a)(1).  The interim trustee oversees the administration of a debtor's bankruptcy estate and has all the rights, duties, and obligations of a trustee, unless or until another individual is elected under

chapter 7 as the permanent trustee.  11 U.S.C. § 702(b) and (c). If an election is requested, section 702 of the

Bankruptcy Code provides, in pertinent part, that:

> (a)  A creditor may vote for a candidate for trustee only if such creditor—
>  (1)  holds an allowable, undisputed, fixed, liquidated, unsecured claim of a kind entitled to distribution under section 726(a)(2), 726(a)(3), 726(a)(4), 752(a), 766(h) or 766(i) of this title;
>  (2)  does not have an *interest materially adverse*, other than an equity interest that is not substantial in relation to such creditor's interest as a creditor, to the interest of creditors entitled to such distribution; and
>  (3)  is not an insider.

11 U.S.C. § 702(a) (emphasis added).  In order to determine whether a creditor is eligible to vote under section

702(a), at or before the initial meeting of creditors under section 341 of the Bankruptcy Code the creditor must

have filed a proof of claim or a writing setting forth facts evidencing a right to vote. Fed. R. Bankr. P. 2003(b).

See also In re Michelex Ltd., 195 B.R. 993, 1008 (Bankr. W.D. Mich. 1996) (finding that proofs of claims filed

after the section 341 meeting but before the hearing on the disputed election are not considered in the universe of

claims eligibility to request for and vote at an election).  A creditor's right to vote is not automatic, however, as a

creditor's claim may be disallowed for voting purposes if a proper objection is raised.  Fed. R. Bankr. P.

2003(b)(3).

Creditors satisfying the eligibility requirements under section 702(a) and holding at least twenty percent

in the amount of claims eligible to vote under section 702(a)(1) may request a trustee election at the meeting of

the creditors. 11 U.S.C. § 702(b).  Only such twenty percent holders are eligible to vote in the election, and the

candidate receiving a majority in amount of claims under section 702(a)(1) becomes the permanent trustee.  11

U.S.C. § 702(c).  If, however, creditors do not request an election or there are insufficient eligible creditors

present to satisfy the twenty percent threshold requirement, then the interim trustee becomes the permanent

trustee. 11 U.S.C. § 702(d).

If a creditor objects to another creditor's voting eligibility under section 702(a)(1), it is incumbent upon

the objecting party to "present facts from which the court can reasonably conclude that after a sufficient time for

discovery the objecting party could present evidence of equal probative force to that of the creditor's claim."  In re

New York Produce Am. & Korean Auction Corp., 106 B.R. 42, 47 (Bankr. S.D.N.Y. 1989) (quoting In re Poage,

92 B.R. 659, 665 (Bankr. N.D. Tex. 1988)).  If the objecting party satisfies this burden, "the claim should be disallowed for voting purposes unless the claimant presents sufficient facts from which the court could reasonably conclude that after a reasonable time for discovery, the claimant could prove the validity and amount of his claim by a preponderance of the evidence." Id., 106 B.R. at 47-48.  However, a vaguely phrased objection does not render a claim disputed for purposes of section 702(a)(1).  In re Petters Co., Inc., 425 B.R. 534, 553 n. 25 (Bankr. D. Minn. 2010). Similarly, an unsupported allegation of a dispute regarding a claim is also insufficient to disqualify a creditor's claim.  In re Centennial Textiles, Inc., 209 B.R. 31, 34 (Bankr. S.D.N.Y. 1997).

In addition to having an allowable, undisputed, fixed, liquidated, unsecured claim under section 702(a)(1), the creditor cannot hold an interest materially adverse to other creditors.  11 U.S.C. § 702(a)(2).  "The relevant time to measure a creditor's adverse interest is the date of the election." In re Klein, 119 B.R. 971, 975 (Bankr. N.D. Ill. 1990).  See also In re TBR USA, Inc., 429 B.R. 599, 627 (Bankr. N.D. Ind. 2010).  "Neither the [Bankruptcy] Code nor the Bankruptcy Rules provide a definition of the phrase 'interest materially adverse' used in § 702(a)(2).  The legislative history, however, indicates that a court is required to balance the competing factors in any specific instance to makes its determination." New York Produce Am. & Korean Auction Corp., 106 B.R. at 47.  See also TBR USA, Inc., 429 B.R. at 627; Michelex Ltd., 195 B.R. at 1009.  These factors include, but are not limited to, the nature and size of the adverse interest and the degree to which the interest is adverse.  TBR USA, Inc., 429 B.R. at 627 (quoting In re NNLC Corp., 96 B.R. 7, 8 (Bankr. D. Conn. 1989)); Petters Co., Inc., 425 B.R. at 550 (finding that a determination of whether an interest is materially adverse must take into consideration the nature, magnitude, and degree of the creditor's interest and the interests of the general body of unsecured creditors).  See also S. Rep. No. 95-989, 95th Cong., 2d Sess. 92, U.S. Code Cong. & Admin. News 1978, pp. 5963, 6053. Claims between creditors that do not reduce the size of the estate would not reduce the amount available for distribution to creditors, and therefore, would not constitute an interest materially adverse to other creditors for purposes of section 702.  Claims by a creditor seeking a recovery against a third party postpetition in competition with the estate would constitute a classic pattern of material adversity.  Klein, 119 B.R. at 974-75 (finding that a creditor having the prospective ability to enhance its recovery at the estate's

expense holds an interest materially adverse to the estate).  See also Riemer & Braunstein LLP v. DeGiacomo (In re A & E 128 N. Corp.), 528 B.R. 190, 199 (B.A.P. 1st Cir. 2015); TBR USA, Inc., 429 B.R. at 628.

Thus, in determining whether a creditor's interest is materially adverse, the court must consider the effect of the adverse interest on the creditor body as a whole (i.e., whether it would minimize distributions to other creditors of the estate).  Klein, 119 B.R. at 974.  If a creditor holds an interest that is adverse to other creditors, but the interest is not "materially adverse," then that creditor will not be disqualified from voting in a trustee election. Id.  Where a creditor may have received an avoidable transfer such as a preference, courts have found that the creditor has an interest materially adverse to other creditors. This is so because such creditor's primary interest is to defend against the preference claim asserted by the bankruptcy estate while the estate's interest is to recover the alleged preference for the benefit of all creditors.  A & E 128 N. Corp., 528 B.R. at 200 n. 11; TBR USA, Inc., 429 B.R. at 628-29; In re Amherst Techs., LLC, 335 B.R. 502, 508 (Bankr. D.N.H. 2006); Centennial Textiles, Inc., 209 B.R. at 33.  Moreover, the requirement that a creditor not have an interest materially adverse to other creditors is to prevent a creditor with a disputed claim against the estate from participating in an election and choosing its opponent, i.e., the permanent trustee, who will be responsible for investigating, prosecuting and settling any claim against the creditor itself.  TBR USA, Inc., 429 B.R. at 629.

Similarly, the mere filing of a pre-petition lawsuit does not automatically render the plaintiff/creditor the holder of an "interest materially adverse" to other creditors entitled to a distribution.  Instead, bankruptcy courts must look at the nature of the underlying lawsuit and the amount of recovery sought, and consider what effect, if any, the lawsuit might have on other creditors entitled to a distribution. Likewise, simply raising an objection to a creditor's eligibility for purposes of preventing that creditor from voting in the trustee election is insufficient to find a creditor has an interest materially adverse to other creditors. Rather, the objection cannot be frivolous, and must be supported by more than a "mere suspicion and may not be interposed for an improper purpose." Amherst Techs., LLC, 335 B.R. at 509 (finding an objection based upon a detailed analysis conducted by an experienced accounting firm regarding payments received by a creditor within 90 days of the petition date was more than a hunch that a creditor received preferential transfers that would render it materially adverse to other creditors).

22

II.    Objections to the Eligibility of the Canadian Northern Creditors.

    A.  Elements of Section 702(a) That Are Not In Dispute.

With respect to the eligibility of the members of the Canadian Northern Creditors, sections 702(a)(1) and (a)(3) of the Bankruptcy Code are not in dispute. None of the objections assert that the Canadian Northern Creditors are insiders as prohibited by section 702(a)(3).  In addition, no objections to the proofs of claim filed by the Canadian Northern Creditors has been filed, and the Rosenberg Group previously represented to the Court that it had no knowledge of any basis to object to the proofs of claim filed by the Canadian Northern Creditors. June 2 Hr'g Tr. 40:1-6.  Thus, each of the Canadian Northern Creditors holds an allowable, undisputed, fixed, liquidated, unsecured claim as set forth under section 702(a)(1).

    B.  Twenty Percent Threshold Requirement under Sections 702(b) and (c).

It also has not been disputed by the parties that the Canadian Northern Creditors, together, hold more than the requisite twenty percent in amount of the claims eligible to vote under section 702(a)(1).  In determining whether creditors have satisfied the twenty percent threshold to request an election be held, section 702 and the Bankruptcy Rules do not define the universe of claims that should be considered in determining eligibility to request for and to vote at a chapter 7 trustee election. The approach taken by various courts interpreting the twenty percent threshold can be separated into three main schools of thought as to the universe of claims that should be considered.  One school of thought is that the debtor's schedules should be the sole basis to determine the amount of eligible claims that fall within the requirements of section 702(a).  In re Lindell Drop Forge Co., 111 B.R. 137, 145 (Bankr. W.D. Mich. 1990); In re Blanchard Mgmt. Corp., 10 B.R. 186, 189 (Bankr. S.D.N.Y. 1981).  The second school of thought is that proofs of claims filed as of the date of the section 341 meeting should be used to determine the universe of claims.  In re Lake States Commodities, Inc., 173 B.R. 642, 646 (Bankr. N.D. Ill. 1994). Courts following this approach reason that under Bankruptcy Rule 2003(b)(3), a proof of claim and the amount listed on the face of the claim is deemed allowed unless a party in interest objects prior to or at the section 341 meeting.  Id., 173 B.R. at 646-47.  The third school of thought or the expansive approach is to look at the debtor's schedules as modified by proofs of claim filed prior to the section 341 meeting.  Michelex Ltd., 195 B.R. at 1006-1007 (finding that where a proper proof of claim is filed before or at the section 341 meeting, then it supersedes

23

the debtor's schedules and the universe of claims must be adjusted by the proofs of claims actually filed).  See also A & E 128 N. Corp., 528 B.R. at 197; Petters Co., Inc., 425 B.R. at 553; Caudill v. N.C. Mach., Inc. (In re Am. Eagle Mfg., Inc.), 231 B.R. 320, 329 (B.A.P. 9th Cir. 1999).

While this Court has not adopted any particular approach, the Court notes under the circumstances of this case, it cannot rely on the accuracy of the Debtor's bankruptcy schedules.  First, the schedules were not prepared by the Debtor but by Mr. Rosenberg, a creditor and an insider of the Debtor who has an interest in disputing the claims of other creditors, especially BARM and certain of the Canadian Northern Creditors who have asserted claims against him in prepetition litigation.  Second, there is no evidence that the schedules are reflective of the Debtor's books and records as Mr. Kirschenbaum, who signed the schedules on behalf of Mr. Rosenberg, declared that he did not conduct any due diligence in preparing the schedules and could not attest to the accuracy or completeness of the schedules.  Therefore, for purposes of eligibility, the Court can only look to the proofs of claim filed prior to the 341 Meeting held on April 22, 2015.

Of the twenty-five proofs of claim filed prior to the 341 Meeting, nine were filed by the BARM Group.  These claims are the subject of an objection filed by the Rosenberg Group prior to the 341 Meeting and the issue of their eligibility has been held in abeyance pending the determination of this motion by the Canadian Northern Creditors to resolve the election controversy.[23]  Claim No. 1 by ASK, LLP in the amount of $22,609.60 for unpaid legal fees incurred in this chapter 7 case during the gap period before Michael Jude Jannuzzi, Esq. was substituted as the Debtor's bankruptcy counsel, is characterized as a priority claim under sections 507(a)(2) and 502(f) of the Bankruptcy Code.  Claim No. 3 filed by Mr. Rosenberg and Claim No. 4 filed by Mr. Kessler are subject to written objections filed by the BARM Group prior to the 341 Meeting.  Furthermore, Mr. Rosenberg is an insider

---

[23] BARM's Claim No. 7 represents a collective claim of $51,221,629.10 on behalf of its members.  However, for voting purposes, the proofs of claim filed by each of its respective members (Claim Nos. 12, 13, 14, 15, 16, 17, 18, and 19) total $48,626,589.85 which is the amount the BARM Group seeks to have included for purposes of determining the twenty percent threshold pursuant to section 702(b) of the Bankruptcy Code.  [ECF No. 199].  If the claims of the BARM Group were to be considered in the universe of claims, the amount of the Canadian Northern Creditors' claims would be less than the requisite twenty percent threshold.  However, the effect of the claims of the BARM Group on the eligibility of the Canadian Northern Creditors to request and vote at a trustee election is irrelevant with respect to the outcome of the election as both groups voted for Mr. Frankel to be the permanent chapter 7 trustee.  The only way the claims of the BARM Group can be included in the universe of claims to request and vote at an election is that there is a finding or concession that the claims of the BARM Group satisfy all the elements under section 702(a), in which case, Mr. Frankel will became the permanent trustee anyway given the magnitude of the BARM Group's claims.

of the Debtor and is ineligible to vote. While Mr. Kessler's counsel did cast a vote at the 341 Meeting, the U.S. Trustee determined in its Election Report that the proxy submitted by Mr. Kessler's counsel was not signed by Mr. Kessler in the presence of a notary but rather showed a conformed signature and was not notarized as required by Bankruptcy Rule 9010(c). [ECF No. 187]. Accordingly, the proxy could not be used to vote at the 341 Meeting. Claim No. 5 filed by Alfred Schonberger and Claim No. 6 filed by Mordechai Shulman appear to be unliquidated and contingent claims as the basis of their claims stems from any personal liability that may arise from the Canadian Northern Lawsuit or litigation by BARM. Similarly, Claim No. 20 filed by Zucker & Kwestel and the proofs of claims filed by the Leifer Group (Claim Nos. 23, 24 and 25) are contingent in that the claimants are defendants in a prepetition actions filed by BARM or some of the members of the BARM Group and they have filed claims for indemnification or contribution against the Debtor with respect to any liability arising therefrom. They too, therefore, are not eligible under section 702(a) to request or vote in the trustee election. Claim No. 21 filed by the New York State Department of Taxation and Finance ("NYS Tax") consist of a priority claim in the amount of $14,406.50 and a general unsecured claim in the amount of $5,050.64.

The universe of claims that appear to be allowable, undisputed, fixed, liquidated, unsecured and entitled to distribution as set forth under section 702(a)(1) are: (1) Claim No. 2 in the amount for $240,000 filed by the Borgata; (2) Claims Nos. 8, 9, 10, 11, and 22 filed by the Canadian Northern Creditors in the aggregate amount of $8,250,000; and (3) the unsecured tax portion of Claim No. 21 filed by the NYS Tax in the amount of $5,050.64. These claims total $8,495,050.64. If the Canadian Northern Creditors are found to not be materially adverse to other creditors as set forth under section 702(a)(2), then twenty percent of the eligible claims would be $1,699,010.13. Because the claims of the Canadian Northern Creditors total $8,250,000, their claims would exceed the twenty percent threshold of the claims eligible to request for and vote at the trustee election.

C.  Whether the Canadian Northern Creditors Have an Interest Materially Adverse to Creditors.

1.  General.

Having concluded that the dollar amount of the claims held by the Canadian Northern Creditors meets the twenty percent threshold, the Court will now turn to the Canadian Northern Creditors' request to resolve this contested election in favor of the election candidate, Mr. Frankel. In considering this request,

the Court will first address the arguments presented by the Rosenberg Group in its April 21 Letter, at the 341 meeting, in the May 22 Objection, at the June 2 Conference, in the July 16 Reply Letter, and at the July 23 Conference.  The Rosenberg Group contends that the Canadian Northern Creditors are ineligible to request for and vote at a trustee election under section 702(a)(2) because (a) an agreement to share in the proceeds of the liquidation of estate assets exists between the BARM Group and the Canadian Northern Creditors, and (2) the Canadian Northern Lawsuit is pending.  The Court will then address whether the Rosenberg Group's late objection on the basis of the FP Lawsuit should be considered.  As noted above, because the amount of the claims of the Canadian Northern Creditors, as a whole or individually, constitutes the majority of the eligible amount of claims that actually did vote (aside from the BARM claims), if the Canadian Northern Creditors are found not to have an interest materially adverse under section 702(a)(2), then sufficient votes have been cast in favor of Mr. Frankel and he will be elected permanent trustee.

2.    The Alleged Agreement.

The Rosenberg Group repeatedly alleges that the Canadian Northern Creditors, of which the Family Partnership is a member, are ineligible to vote because, "upon information and belief, the Canadian Northern Creditors have entered into an agreement with BARM … under which (they) will receive a portion of the proceeds generated by BARM through liquidation of the Debtor's assets which BARM refuses to turn over to the interim trustee."  April 21 Letter.  The Canadian Northern Creditors and the BARM Group have consistently denied, in pleadings and on the record, the existence of any alleged agreement between the two parties.  At the July 23 Conference, the Court directed that, in lieu of live testimony on the subject of any alleged agreement, counsel for the Canadian Northern Creditors submit a declaration from each Canadian Northern Creditor setting forth the direct testimony of the witness (the "Declarations").  Neither Mr. Pergament, the Rosenberg Group nor any party in interest lodged an objection to taking the direct testimony of each witness in statement form. The Court further directed that (i) the Declarations be provided to Mr. Pergament and the Rosenberg Group prior to the Aug. 11 Evidentiary Hearing, and (ii) each declarant be available for live cross-examination and re-direct at the Aug. 11 Evidentiary Hearing.  Mr. Pergament was instructed to advise counsel which declarant(s) he intended to cross-examine at the Aug. 11 Evidentiary Hearing as only those witnesses whom he intended to cross-examine

26

need appear at the evidentiary hearing.  The Declarations were served on Mr. Pergament, counsel for the Rosenberg Group and counsel for Kessler.  Pursuant to the Court's directive, Mr. Pergament advised counsel for the Canadian Northern Creditors in writing that it would not be necessary for the declarants to appear at the Aug. 11 Evidentiary Hearing for cross-examination.  Aug. 11 Evidentiary Hr'g Tr. 9:3-7.  At the Aug. 11 Evidentiary Hearing, neither Mr. Pergament, the Rosenberg Group nor any party in interest objected to the direct testimony of the Canadian Northern Creditors via the Declarations, and no cross-examination was requested.  Aug. 11 Evidentiary Hr'g Tr. 96:14-19.  The Declarations were offered as an exhibit and received in evidence.

The Declarations establish that no alleged agreement or arrangement exists between the BARM Group and the Canadian Northern Creditors, individually or collectively, with respect to the proceeds generated by BARM through liquidation of the Debtor's assets.  Accordingly, the alleged agreement raised by the Rosenberg Group was only a mere suspicion unsupported by any factual evidence; and therefore, its objection to the Canadian Northern Creditors' eligibility under section 702(a)(2) on this ground is overruled.

3.    The Canadian Northern Lawsuit.

The only other ground asserted by the Rosenberg Group prior to the Aug. 11 Evidentiary Hearing on the issue of whether the Canadian Northern Creditors hold an interest materially adverse to the other creditors is the Canadian Northern Lawsuit.  As to this ground, first, the Family Partnership is not a party to the Canadian Northern Lawsuit and it therefore cannot have an interest materially adverse to other creditors by reason of the Canadian Northern Lawsuit.

Second, as to the other members of the Canadian Northern Creditors, the Rosenberg Group argues that the Canadian Northern Lawsuit seeks to recover funds transferred to third parties as a result of Barkany's fraudulent schemes.  Thus, the Rosenberg Group contends that as plaintiffs in the Canadian Northern Lawsuit, the Canadian Northern Creditors would be competing with the bankruptcy estate in pursuit of those very funds and, if successful, reduce the distribution to general unsecured creditors.  This argument, however, fails to consider the effect the bankruptcy case has on the Canadian Northern Lawsuit and ignores how the claims held by victims of an investment scam are treated in a bankruptcy case.

a.    The Automatic Stay and its Effect on the Canadian Northern Lawsuit.

Acceptance of the theory espoused by the Rosenberg Group would mean that the mere filing of a prepetition action by a creditor against third party transferees of a debtor's property renders such creditor ineligible to vote for a permanent trustee because the plaintiff-creditor will have a prospective interest materially adverse to creditors of the bankruptcy estate.  This theory disregards the breadth of the automatic stay imposed by section 362(a) of the Bankruptcy Code.[24]  To the extent the Canadian Northern Lawsuit seeks to avoid a transfer of the Debtor's property to third party defendants as a fraudulent conveyance under state debtor-creditor law, such "third party action to recover fraudulently transferred property is properly regarded as undertaken 'to recover a claim against the debtor' and subject to the automatic stay pursuant to § 362(a)(1)."  Keene Corp. v. Coleman (In re Keene Corp.), 164 B.R. 844, 850 (Bankr. S.D.N.Y. 1994) (quoting FIDC v. Hirsch (In re Colonial Realty Co.), 980 F.2d 125, 131-132 (2d Cir. 1992)).  Only the trustee has standing to pursue such claims postpetition for the benefit of a debtor's bankruptcy estate.  As such, creditors do not have standing postpetition to pursue a fraudulent conveyance action against the recipients of an avoidable transfer of a debtor's property.  Keene Corp., 164 B.R. at 851 (noting that with respect to claims against those who have misused the debtor's property, "[t]he Bankruptcy Code authorizes the trustee to prosecute such claims for the benefit of all creditors, and necessarily deprives individual creditors of standing to pursue the same claims for their sole benefit"); St. Paul Fire and Marine Ins. Co. v. Pepsi Co., Inc., 884 F.2d 688, 701-02 (2d Cir. 1989).  Thus, commencement of the Canadian Northern Lawsuit to recover funds alleged to have been fraudulently conveyed by the Debtor does not equate to the Canadian Norther Creditors having an interest materially adverse to creditors in this bankruptcy case.  They are stayed from pursuing the fraudulent conveyance action and lack standing to prosecute such claims.

b.    The Investment Scam and Treatment of Defrauded Victims' Claims.

The remaining counts in the Canadian Northern Lawsuit seek recovery for conversion, unjust enrichment, and aiding and abetting fraud.  Mr. Pergament argues that these causes of action likewise place the Canadian Northern Creditors in competition with the estate for recovery of estate assets and thus renders the Canadian

---

[24]As previously noted, the state court docket for the Canadian Northern Lawsuit shows an absence of any substantial activity in the lawsuit and appears to be in an administrative hold pending this bankruptcy proceeding.

Northern Creditors ineligible under section 702(a)(2).  Prior to the Aug. 11 Evidentiary Hearing, Mr. Pergament presented counsel for the Canadian Northern Creditors with a stipulation providing for the assignment of their third party claims to the estate. Counsel did not sign the proposed stipulation.  At the Aug. 11 Evidentiary Hearing, Mr. Pergament asserted that if counsel had signed the stipulation, thus agreeing not to proceed with the Canadian Northern Lawsuit, including claims asserted against Gerson and the Montague Firm, then no conflict exists as to asset recovery and Mr. Frankel should be the trustee.  Aug. 11 Evidentiary Hr'g Tr. 91:11-22.

Mr. Pergament contends that refusal to sign the proposed stipulation demonstrates that the Canadian Northern Creditors intend to pursue their third-party claims which would conflict with the estate's interest. Id. 91:23-92:6.  The BARM Group contends that these claims do not belong to the estate as they constitute independent causes of action against third parties for their own wrongdoing.  Any recovery, the BARM Group asserts, would come not from estate assets, but rather from the third party defendants themselves or other sources.  Thus, the BARM Group concludes, there is no competition with the bankruptcy estate and, correspondingly, no interest materially adverse to other creditors.  In support, the BARM Group notes that funds deposited by the Canadian Northern Creditors allegedly in escrow and subsequently transferred to the defendants in the Canadian Northern Lawsuit can be traced.  These funds, the BARM Group avers, belong to the plaintiffs, i.e., the Canadian Northern Creditors, and are not property of the bankruptcy estate and would not, in any event, be available for distribution to creditors.

This argument by the BARM Group, while compelling, is at odds with the effect of the automatic stay and a central theme of bankruptcy, equality of distribution. Section 362(a)(3) of the Bankruptcy Code provides that the filing of the bankruptcy petition operates as a stay against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3). Whether a trustee has standing to bring tort actions normally asserted by creditors against third parties depends upon the facts and circumstances of each case and the causes of action pled in the third party lawsuit.  Where the claims against the third party defendants stem from a common set of facts as the fraudulent conveyance claims, i.e., the third party defendants' involvement in a fraudulent investment scheme perpetrated by the debtor with multiple victims, then there is no rationale for certain victims of the fraudulent scheme to receive more than their

fair share by proceeding against the third party defendants while other victims of the same or similar fraudulent investment scheme are limited to a distribution from the bankruptcy estate.

"Courts have favored *pro rata* distribution of assets where . . . the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 88-89 (2d Cir. 2002) (citing cases where the courts approved a *pro rata* distribution plan where multiple victims were defrauded even though the majority of the funds were traceable to specific claimants).

Notwithstanding the BARM Group's arguments that the funds allegedly placed in escrow are traceable, the Court observes that the cases cited by the BARM Group did not occur in the context of a fraudulent investment scheme with multiple victims who are similarly situated.  While the Court is not asked to find, on the record before it, that the Debtor pled guilty to operating a Ponzi scheme, the Court notes that the fraudulent investment schemes conducted by the Debtor appear similar to a Ponzi scheme.  Barkany confessed that he misrepresented the nature of the investments or the profitability of such investments in order to defraud the investors out of their money, used the funds for purposes other than making the investments, and paid some of the victims with funds he received from other victims.  Affidavit of Confession, at 2-3.  As such, ratable distribution among defrauded victims is fitting.

> [T]he use of a *pro rata* distribution has been deemed especially appropriate for fraud victims of a "Ponzi scheme," in which "earlier investors return are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity."

Id., 290 F.3d at 89 (quoting SEC v. Credit Bancorp, Ltd., No. 99 CIV. 11395–RWS, 2000 WL 1752979, at *13 (S.D.N.Y. Nov. 29, 2000)) (internal citations omitted).

> In such a scheme, whether at any given moment a particular customer's assets are traceable is "a result of the merely fortuitous fact that the defrauders spent the money of the other victims first."

Id., 290 F.3d at 89 (quoting United States v. Durham, 96 F.3d 70, 72 (5th Cir. 1996)).  See also In re Dreier LLP, 429 B.R. 112, 135 (Bankr. S.D.N.Y. 2010).  While the District Court in this district has held in United States v. Ovid, No. 09-CR-216 (JG)(ALC), 2012 WL 2087084, at * 8 (E.D.N.Y. June 8, 2012), that a constructive trust

may be imposed with respect to funds that are traceable in a fraudulent scheme with multiple victims and separate funds, Ovid was not a bankruptcy case.

In the context of a bankruptcy case, the bases of the third party claims are generally irrelevant if they seek to recover potential estate assets to address injuries that are common to all the victims, not just the third party plaintiffs. Picard. v. Stahl (In re Madoff), 443 B.R. 295, 314 (Bankr. S.D.N.Y. 2011) (finding that "[w]hether sounding in bankruptcy, state law or common law, and whether purporting to recover fraudulent transfers or tort damages, the [third party actions] seek to recover potential estate assets to redress harms common to all victims of [the debtor's] massive Ponzi scheme, that consistent with the purposes of the automatic stay, belong exclusively to the [t]rustee"). Where the third party complaint alleges claims that normally would be an independent cause of action, but the injury suffered is generalized to all or most of the creditors of the bankruptcy estate, then those claims belong to the bankruptcy estate.

> The Second Circuit has held that "[i]f a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989); *see also The 1031 Tax Group*, 397 B.R. at 679 ("To determine standing, the Court must look to the underlying wrongs as pleaded in the complaint and whether the plaintiff alleges a particularized injury."). In order to assert such a claim independently of the administration of the bankruptcy case, a creditor must have suffered an injury "significantly different" from the injuries to creditors in general. *In re Sage Enter., Inc.*, No. 04-B-05548, 2006 WL 1722582, at *15 (Bankr. N.D. Ill. Apr. 28, 2006) (*quoting Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989)) ("[W]here the creditors' injury, while having some personal elements, overlaps with injury suffered by other creditors . . . the question to be answered is whether the injury to the creditor is 'significantly different' from the injuries to other creditors in general"). Conversely, "if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate. *Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1284 (5th Cir. 1994) (citations omitted).

Id., 443 B.R. at 311-12 (finding third party actions against the debtor's insiders and officers and directors are stayed under section 362(a)(3) of the Bankruptcy Code as the claims of misrepresentations and violations of duties owed derivatively to all customers and creditors were not made directly and solely to the plaintiffs and failed to result in any separate and particularized harm); McHale v. Alvarez (In re The 1031 Tax Group), 397 B.R.

670, 683 (Bankr. S.D.N.Y. 2008) (finding that certain creditors' causes of action for conspiracy and aiding and abetting conversion against the debtor's former employees are derivative claims that belong to the trustee where, *inter alia*, the claims are based upon the looting of funds by the debtor's sole individual member and director when he diverted $104 million of funds from multiple participants for other investments or to maintain a lavish lifestyle, and there was no allegation that the member looted only these creditors or that his looting was specifically directed towards the plaintiffs but rather the claims were allegations of a generalized injury to all similarly situated creditors).

Bankruptcy provides a mechanism for (a) creating a bankruptcy estate through the recovery of assets that were transferred pursuant to, or generated from the proceeds of, a Ponzi or such other fraudulent scheme perpetrated by a debtor and (b) treating all similarly situated creditors of a debtor's fraudulent scheme equally. Meoli v. Huntington National Bank (In re Teleservices Group, Inc.), 463 B.R. 28, 36 (Bankr. W.D. Mich. 2012) (concluding that a creditor's unjust enrichment and constructive trust action against a third party recipient of funds obtained through a fraudulent scheme should be stayed because, in part, "the overall objective of a bankruptcy proceeding is to create a single forum into which all recoveries . . . are to be brought and then distributed"). The automatic stay stops creditor collection activity and, by doing so, allows the trustee to bring causes of action against third parties for the benefit of all creditors, promotes an orderly resolution of claims and fosters creditor equality. Creditor equality has been described as one of the most important purposes of bankruptcy. "It is obviously one of the purposes of Bankruptcy law that there should be a speedy disposition of the bankrupt's assets. This is second only in importance to securing equality of distribution." Bailey v. Glover, 88 U.S. 342, 346 (1874). Without the automatic stay and the exclusive standing given to the chapter 7 trustee to pursue these third party claims, victims, free to pursue claims against third parties for a common injury arising from a pervasive fraudulent scheme, would "'convert the bankruptcy proceedings into a race to the courthouse,' and effectively 'derail the bankruptcy proceedings.'" Stahl, 443 B.R. at 311-312 (quoting Fisher v. Apostolou, 155 F.3d 876, 883 (7th Cir. 1998)).

In this instance, the injury suffered by the Canadian Northern Creditors from the second investment scheme, which gave rise to the Canadian Northern Lawsuit, is similar to the injury endured by the Cortland

Victims from the first investment scheme perpetrated by Barkany.  Both schemes involved nonexistent real estate investments in which the victims transferred funds allegedly to either Barkany, one of his entities, or attorney escrow accounts maintained by law firms Barkany used for his transactions.  Although the schemes involved different victims and while the BARM Group argues that the funds deposited into the account of First American Title Insurance Corp. are traceable to deposits made by some of the Canadian Northern Creditors, a portion of those funds may have been transferred to members of the BARM Group thus providing them an investment return from funds later infused by the Canadian Northern Creditors as opposed to a return generated by a legitimate investment activity. Although the Canadian Northern Creditors did allege that Gerson and the Montague Firm owed a duty to disclose the truth about the Debtor when asked, there is nothing in the record before this Court evidencing that the third party defendants, in particular, Gerson and the Montague Firm, conducted themselves any differently with respect to the plaintiffs in the Canadian Northern Lawsuit than with respect to other victims of the Debtor's fraudulent schemes.  The Canadian Northern Lawsuit alleges that Gerson and the Montague Firm acted as the transactional attorneys for the purported investments, but there is no allegation that they were counsel for the plaintiffs in the Canadian Northern Lawsuit or that the parties had entered into a retainer agreement.  In fact, all of the causes of action pled in the Canadian Northern Lawsuit, including the fraudulent conveyance claims, are based upon the same set of facts, i.e., that the defendants were part of the Debtor's fraudulent investment scheme.  Indeed, even the separate claim against Gerson and the Montague Firm is for aiding and abetting fraud (i.e., the fraud perpetrated upon plaintiffs through the Debtor's fraudulent scheme).  Any representations made by Gerson and the Montague Firm to the Canadian Northern Creditors as  plaintiffs in the Canadian Northern Lawsuit appear to be no different than those alleged to have been made to the Family Partnership and which form the basis of the FP Lawsuit.

Further, both the Canadian Northern Creditors and the BARM Group do not specify how the harm inflicted upon the Canadian Northern Creditors was significantly different and particular to them as opposed to other victims of the Debtor's fraudulent schemes.  Nor do they specify how it is that the Canadian Northern Creditors possess independent causes of action against third parties separate from the bankruptcy estate, i.e., causes of action that could not have been asserted by the estate at the commencement of the bankruptcy case.

33

While the BARM Group argues that some of the investment funds could be traced from 169 16th Street LLC's

bank account to the Schonbergers because checks were issued directly to them, there is no allegation of direct

contact or communication between 169 16th Street LLC and the Schonbergers, and no allegation of any

representation made by the Schonbergers to 169 16th Street LLC.  It seems that 169 16th Street LLC transferred the

funds at the behest of the Debtor in furtherance of the investment scam.

In sum, on the record before the Court, and based on the allegations in the complaint, the injury suffered

by the Canadian Northern Creditors is no different than the harm suffered by creditors in general. The claims

asserted in the Canadian Northern Lawsuit are essentially fraudulent conveyance claims that belong to the

bankruptcy estate for the benefit of all creditors and the Canadian Northern Lawsuit has thus been stayed by

section 362(a)(3) of the Bankruptcy Code.  Therefore, at the time of the 341 meeting, the Canadian Northern

Creditors did not have an interest materially adverse to the creditors of this bankruptcy estate by reason of the

Canadian Northern Lawsuit such that they and each of them were ineligible to vote in a trustee election under

section 702(a)(2) of the Bankruptcy Code.

4. Post-Election Objection Regarding the FP Lawsuit.

As to the Rosenberg Group's late objection to the eligibility of the Family Partnership to request for and

vote at a trustee election because the FP Lawsuit constitutes an interest materially adverse to the creditors of the

bankruptcy estate, neither the Bankruptcy Code nor the Bankruptcy Rules provide a statutory deadline as to when

objections to a creditor's voting eligibility under section 702 must be raised.  "[T]here does not appear to be any

authority regarding the formality with which an objection must be voiced in the § 702 context." A & E 128 N.

Corp., 528 B.R. at 202 (citing In re Sforza, 174 B.R. 656 (Bankr. D. Mass. 1994)).  Generally, courts do not

consider post-election objections that were not raised at the time the trustee election is held. See Lake States

Commodities, Inc., 173 B.R. at 647 (finding that any objections must be made at the time the vote is taken

otherwise the election process would be undermined if a court allowed parties to object after the votes have been

tabulated); Sforza, 174 B.R. at 658 (finding the debtor's written, post-election objection to a creditor's proof of

claim to be untimely).  Although it is within the court's discretion to consider whether a creditor satisfies the

eligibility requirements of section 702(a) on grounds other than those raised in an objection made pre-election,

34

Centennial Textiles, Inc., 209 B.R. at 34, there must, at the very least, be some clearly articulated objection raised at or before the section 341 meeting so as to preserve the issue of eligibility for the court to determine by way of the election report and a motion to resolve the election.  A & E 128 N. Corp., 528 B.R. at 202; Sforza, 174 B.R. at 658.

While this Court is not adopting a *per se* rule that a party's objection is limited to the grounds or arguments raised at or before the section 341 meeting, it nevertheless finds that all relevant and specific grounds for objecting to a creditor's voting eligibility must be promptly raised so as to not drag out the election dispute and prejudice the bankruptcy estate.  Section 702 and Bankruptcy Rule 2003 "are designed for prompt, streamlined and effective selection of a trustee.  The selection process is designed to move swiftly—but, leavened with ample and effective safeguards to satisfy principles of due process."  See In re USA Capital, LLC, 251 B.R. 883, 888 (Bankr. D. Colo. 2000).  "Speed and efficiency is absolutely necessary in bankruptcy cases."  Michelex Ltd., 195 B.R. at 1010.  A delay in the appointment of the permanent trustee is detrimental to the bankruptcy estate as the uncertainty can stop the administration of the estate, cause a devaluation in assets, increase administrative costs for the estate, and impede the exercise of rights by various parties.  Id.; Amherst Techs., LLC, 335 B.R. at 512.  Indeed, "a trustee election dispute requires a bankruptcy court to balance the need for an accurate resolution of fact-based questions at the initial stage of a case with the need for speedy resolution of the dispute [recognizing] that it is both undesirable and unworkable to turn a trustee election into a full scale trial."  Amherst Techs., LLC, 335 B.R. at 512 (quoting Am. Eagle Mfg., Inc., 231 B.R. 330-31).  Therefore, it is not in the best interest of creditors or the trustee election process if a creditor were able to raise new objections continuously up until an election controversy is decided.  To permit a creditor to object to a party's eligibility to request for and vote at a trustee election by simply asserting the general existence of an interest materially adverse to other creditors and provide unlimited opportunities for the creditor to specify the nature of the adversity post-election without any deadline would render the requirement that an objection be raised before or at the election meaningless, and wreak havoc on the entire trustee election process where expediency and finality are necessary.  After a certain point, bankruptcy courts must move on and finally resolve an election controversy.

Even in A & E 128 N. Corp. where the interim chapter 7 trustee objected to a law firm's eligibility to vote at the election on the ground that there was a long standing personal relationship between an attorney at the firm and the debtor's principal but subsequently raised additional grounds for its objection on the basis of receipt of preferential transfers and the insufficiency of the law firm's proofs of claims, the interim trustee's objections were set forth in its written objection to the creditor's motion to resolve the trustee election dispute. The additional grounds for the interim trustee's objection were made at the earliest opportunity post-election and prior to the hearing on the motion to resolve the controversy. There was no prejudice to creditors or the bankruptcy estate because the additional grounds for the objection were raised early on in the dispute.

In this instance, while the Rosenberg Group did preserve its objection to the eligibility of the Canadian Northern Creditors to vote at an election by raising the grounds for its objection in the April 21 Letter and at the 341 Meeting, the Rosenberg Group failed to raise the issue of the FP Lawsuit promptly as an independent basis for its objection to the eligibility of the Family Partnership.[25] Notwithstanding the Rosenberg Group's concession that it inadvertently omitted the FP Lawsuit in its April 21 Letter, the Court finds it implausible that the Rosenberg Group could have also inadvertently failed to raise what it considers so essential to finding an interest materially adverse to the estate not only at the rescheduled 341 Meeting when the election took place, but also in its May 22 Objection to the motions to resolve the election controversy. This collective lapse on the part of the Rosenberg Group persisted through the June 2 Conference, the June 23 and July 13, 2015 hearings on disinterestedness, the filing of the July 16 Reply Letter, and the July 23 Status Conference. The Rosenberg Group did not raise the FP Lawsuit as an additional basis for consideration as to the Family Partnership's eligibility at the July 23 Status Conference where the Court detailed all communications and objections filed by the Rosenberg Group and scheduled the Aug. 11 Evidentiary Hearing on the issues relating to the alleged agreement between the

---

[25] While the Kessler Objection to the motions to resolve the election controversy did obliquely reference two pre-bankruptcy lawsuits filed by the Canadian Northern Creditors against the non-moving parties, it did not specify the FP Lawsuit, which was brought only by the Family Partnership. In fact, the Kessler Objection only listed two lawsuits by some of the members of the Canadian Northern Creditors – the Canadian Northern Lawsuit and the Morrison & Foerster Lawsuit. Kessler Objection, at 3. Allegations of an interest materially adverse must fully explain the reasons why such a conflict exists and cannot rest on a mere assertion or suspicion without any supporting evidence. Amherst Techs., LLC, 335 B.R. at 509. Moreover, because Mr. Kessler did not object to the eligibility of the Canadian Northern Creditors to vote for a trustee at the 341 Meeting, any objection by him was not preserved and cannot be considered by the Court.

BARM Group and the Canadian Northern Creditors and the Canadian Northern Lawsuit.  The FP Lawsuit was not mentioned in any of the Rosenberg Group' pleadings or communications filed with the Court or at any oral argument until the Aug. 11 Evidentiary Hearing.  By the time the Rosenberg Group raised the existence of the FP Lawsuit as an issue, this Court had already held numerous evidentiary hearings and status conferences for which the parties further briefed and argued the issue of Mr. Frankel's disinterestedness and submitted further briefs on the issue of whether the Canadian Northern Creditors are materially adverse, all of which the Rosenberg Group actively participated.  If the FP Lawsuit was so critical to the determination of whether the Family Partnership has an interest materially adverse to creditors of the estate, especially in a heavily contested election, then it is only reasonable to expect that the FP Lawsuit would be raised promptly and at the earliest opportunity in order to afford the Family Partnership sufficient time to meet the objection.

Yet, in the months after the election took place, the Rosenberg Group took every opportunity to object to the eligibility of the Canadian Northern Creditors in writing and in Court, but it chose to raise only two grounds for its objection -- the existence of the Canadian Northern Lawsuit and the purported existence of an agreement between the  BARM Group and the Canadian Northern Creditors, and it argued the merits of those grounds but somehow it failed to alert the parties and the Court as to its objection based upon the FP Lawsuit.  Rather, as noted, this objection was first raised at the Aug. 11 Evidentiary Hearing when it became clear (i) from the Declarations that the Rosenberg Group's existing grounds for objecting to the eligibility of the Family Partnership to vote in the election, i.e., the "agreement or arrangement" with BARM, was speculative and based upon mere conjecture without any evidentiary support, and (ii) that even if the Canadian Northern Lawsuit rendered the other Canadian Northern Creditors ineligible to vote, the Family Partnership is not a party plaintiff to that action and therefore remains eligible to vote absent an objection on other grounds.

This Court sees no reason why a new argument untimely raised by a party pursuant to a motion to resolve an election dispute should be considered any different from any other motion before the Court.  "Arguments first raised in reply memoranda are 'not properly considered,' Int'l Elecs., Inc. v. Media Syndication Global, Inc., No. 02 Civ. 4274 LAK, 2002 WL 1897661, at *3 n. 2 (S.D.N.Y. Aug. 17, 2002), and of course the same is true of arguments first raised by letter several months after reply memoranda and all other motion papers have been

filed." Johnson & Johnson v. Guidant Corp., 525 F. Supp. 2d 336, 359 (S.D.N.Y. 2007) (refusing to consider a new argument raised in a letter after all papers have been filed that New York law rather than New Jersey or Indiana law regarding tortious interference should apply). See also Media Syndication Global, Inc., No. 02 Civ. 4274, 2002 WL 18997661, at * 1 n. 2; Strohl v. Brite Adventure Center, Inc., No. 08 CV 259 (RML), 2009 WL 2824585, at 6 n. 1 (E.D.N.Y. Aug. 28, 2009) (refusing to consider a new argument raised in a post-argument letter to not be properly before the court).

Here, the record reflects a series of consistent and explicit reasons voiced by the Rosenberg Group as to why the Canadian Northern Creditors, including the Family Partnership, are ineligible to vote, i.e., the Canadian Northern Lawsuit and the "agreement or arrangement" with BARM; it also reflects a complete failure by the Rosenberg Group to raise the FP Lawsuit as a separate reason why the Family Partnership was ineligible to cast its vote at the trustee election. Having failed to raise the FP Lawsuit in the April 21 Letter, at the 341 Meeting, and in the May 22 Objection, and where new arguments are not permitted in reply memoranda or subsequent submissions, it is difficult to see why this Court should consider an oral objection by the Rosenberg Group at the evidentiary hearing itself.  Where a party has ample opportunity to raise an objection, yet it fails to do so, either through willful ignorance or inadvertent error, such untimely post-election objection is not properly before the court and cannot be considered.

Even if this Court were to consider the FP Lawsuit as a ground for disqualifying the Family Partnership from voting in the trustee election, the Court nevertheless finds that the FP Lawsuit would not cause the Family Partnership to have an interest materially adverse to the creditors of the bankruptcy estate because, like the Canadian Northern Lawsuit, the FP Lawsuit has been stayed not only by the state court but also pursuant to section 362(a)(3) of the Bankruptcy Code.  In the interest of completeness, the Court sets out here its reasoning for so finding.

First, counsel for Gerson and the Montague Firm filed a letter dated May 22, 2015 with the state court in the FP Lawsuit stating that the FP Lawsuit should be stayed pending the conclusion of the Debtor's bankruptcy

case and the state court's docket for Index Number 502113/2013 currently marks the FP Lawsuit as being "stayed".[26]

Second, similar to the above analysis with respect to the Canadian Northern Lawsuit, the Court looks to whether the Family Partnership has alleged an injury "significantly different" than the injury to other creditors in general. The FP Lawsuit alleges that Gerson misappropriated and converted the FP Funds that the Family Partnership deposited in Gerson's IOLA Trust account and that Barkany, Gerson and the Montague Firm were unjustly enriched as a result. The FP Lawsuit contends that Barkany was introduced to the Family Partnership by Gerson, that Gerson knew of Barkany's disreputable past and his true identity, and the investigation by the Federal Bureau of Investigation regarding Barkany's operation of various investment schemes, and failed disclose such information to the Family Partnership. Gerson represented that Barkany's real estate investments were profitable with the exception of one bad investment due to the economy. Barkany presented the Family Partnership with an investment opportunity in the 103 West 28th Street Investment, which did not exist, and the Family Partnership retained Gerson to represent its interest in such investment opportunity. The Family Partnership wired $750,000 to Gerson and the Montague Firm to hold in the firm's IOLA account for the purpose of making the 103 West 28th Street Investment even though Gerson and the Montague Firm failed to provide a written retainer agreement. The Family Partnership alleged that it believe that Gerson and the Montague Firm were acting as its attorney when they released the FP Funds to the Debtor and used the FP Funds to pay their own expenses without the Family Partnership's authorization.

The BARM Group contends that these claims are independent causes of action by the Family Partnership against Gerson and the Montague Firm for their misappropriation and/or conversion of the Family Partnership's funds. Any recovery by the Family Partnership would be against Gerson and the Montague Firm, their malpractice insurance carrier, if any, and from the New York Lawyers' Fund for Client Protection ("NYS Fund"),

---

[26] Mr. Pergament commenced an adversary proceeding against various third parties who were recipients of alleged fraudulent conveyances ("Trustee's Fraudulent Conveyance Action") but he did not include the Family Partnership as a defendant. Mr. Kirschenbaum, on behalf of the Montague Firm, and Messrs. Schonberger and Rosenberg, defendants in the Trustee's Fraudulent Conveyance Action filed a motion seeking an order directing the joinder of the Family Partnership as a party in the Trustee's Fraudulent Conveyance Action ("Joinder Motion"). [Adv. Pro. No. 15-8244, ECF No. 18.] In response to the Joinder Motion, Mr. Pergament filed a response explaining that "the reason [he] did not believe it to be necessary to name the [Family] Partnership as a party is because the [FP] Lawsuit has been stayed by the State Court . . . . and the claim is being pursued by the Interim Trustee." [Adv. Pro. No. 15-8244, ECF No. 46, at 3-4.]

and therefore such recovery will not diminish the assets of the estate but would in fact reduce the Family Partnership's claim against the bankruptcy estate to the extent of payment received from third party sources. Aug. 11 Evidentiary Hr'g Tr. 70:17-25. Therefore, the BARM Group reasons that the FP Lawsuit would not render the Family Partnership a holder of an interest materially adverse to the bankruptcy estate because the misappropriation and conversion claims are not property of the bankruptcy estate. This is the same reasoning posited by the BARM Group in connection with the Canadian Northern Lawsuit and, as noted above, while compelling, it fails to recognize the import of the automatic stay and the paramount importance of a *pro rata* distribution to all similarly situated victims of a fraudulent investment scheme. The focus must be on how to right the wrong perpetrated upon all of the victims, not to allow the victims to individually pursue estate causes of action for their sole benefit. A distinction must be drawn between an action independent from the bankruptcy estate and one that will serve to benefit all creditors.

In limited circumstances, there may be independent causes of action where the claims allege that the third party defendant owes a duty to the plaintiffs, Fox v. Picard (In re Madoff), 848 F. Supp. 2d 469, 479 (S.D.N.Y. 2012) (finding that third party action for conversion, unjust enrichment, conspiracy and state RICO violations are stayed as those claims are the same claims by the estate against the third party defendants and contained no additional allegations of acts by the third party defendants that were directed against them specifically or any duty owed specifically to the plaintiffs), or where the claims of the plaintiffs are solely against the third party defendants and the plaintiffs have no claim against the bankruptcy estate, Picard v. Fairfield Greenwich Ltd. (In re Madoff), 490 B.R. 59, 66 (S.D.N.Y. 2013) (finding that customers of feeder funds had an independent cause of action against the feeder funds where the customers were not direct customers of the debtor and therefore, were not creditors of the bankruptcy estate). However, even what may appear to be an independent cause of action may be stayed where the trustee and a creditor choose different remedies to rectify the same injustice derived from a third party defendant's receipt of the same transfer. In Teleservices Group, Inc., 463 B.R. at 36, the bankruptcy court stayed a creditor's action for unjust enrichment and constructive trust even though the creditor could trace its fund to the defendant where the trustee commenced a fraudulent conveyance action against the same defendant who was a successor lender to an entity, Cyberco Holdings, Inc., that was used to perpetuate a

40

massive fraud against numerous equipment finance companies.  The defendant managed Cyberco's cash through a revolving line of credit and regular sweeps of Cyberco's bank accounts. Both lawsuits shared a common purpose of seeking to remedy a situation whereby the defendant allegedly benefitted unfairly from receipt of all the funds the equipment finance companies deposited into those bank accounts. Accordingly, the creditor's action was stayed because the trustee's action was for the benefit of all creditors while the creditor's action was for its own benefit.

The allegations in the FP Lawsuit show that harm to the Family Partnership stems from Gerson and the Montague Firm's alleged participation in Barkany's fraudulent investment scheme.  Notwithstanding the assertion that the Family Partnership believed Gerson and the Montague Firm were its attorneys, there is no allegation that the parties entered into a written retainer agreement or that Gerson and the Montague Firm represented to the Family Partnership that they were acting as its attorney.  Other than the use of an IOLA account, the facts and circumstances giving rise to the injury to the Family Partnership are similar to those resulting in injury to the Cortland Creditors and the plaintiffs in the Canadian Northern Lawsuit.  The fact that the FP Funds were deposited into an IOLA account as part of an investment scam is not unique and does not automatically confer upon the Family Partnership standing to pursue such a claim.  The success of a fraudulent investment scheme, in large part, is directly related to providing false reassurance to the victims of the fraud that funds deposited in escrow are inviolate.  Here, the Family Partnership deposited the FP Funds with Gerson for the purpose of participating in the 103 West 28th Street Investment with Barkany.  The fact that the FP Funds may have been released to Barkany prior to the Family Partnership's authorization does not change the underlying basis of the Family Partnership's claim for misappropriation and conversion against Gerson and the Montague Firm, i.e., a generalized claim to recover losses incurred as a result of Barkany's fraudulent investment scheme and Gerson and the Montague Firm's alleged participation in that scheme.  The structure of the fraudulent investment scheme was similar to that perpetrated against the Cortland Creditors and the other Canadian Northern Creditors, and the injuries suffered by the Family Partnership are akin to those suffered by other similarly situated victims of Barkany's investment scam.  Even if Gerson and the Montague Firm kept some of the FP Funds for their own

benefit, those FP Funds, as arguably estate property, may form the basis of a fraudulent conveyance action by the chapter 7 trustee.[27]

Third, the argument that the Family Partnership's claims against Gerson and the Montague Firm for misappropriation and conversion of client funds are not property of the estate is inconsistent with (i) the proof of claim filed by the Family Partnership in this bankruptcy in which it seeks to recover from the estate the same $750,000 (i.e., the FP Funds) transferred to Gerson and (ii) its assertion that it is, therefore, an unsecured creditor of the Debtor and thus eligible to vote at a trustee election.  The inconsistency of this argument is even more apparent when considering the implication if the Family Partnership's claim is not paid in full by Gerson and the Montague Firm, any malpractice insurance carrier and/or the NYS Fund. Having failed to recoup its loss in full, the Family Partnership will assert its claim against the estate, albeit perhaps in a reduced amount after credit given for payments received from third parties. The only reason the Family Partnership would have a claim against the bankruptcy estate under such a scenario is because its claim for misappropriation and conversion arises from the Debtor's fraudulent investment scheme, and not by reason of an independent action against third parties.  Stated differently, if the Family Partnership's claim against Gerson and the Montague Firm for the $750,000 is truly independent of the Debtor's fraudulent investment scheme, then how can the Family Partnership be a creditor of this bankruptcy estate, or even be eligible to vote in a trustee election?  By filing a proof of claim in this bankruptcy estate for the $750,000 it transferred to Gerson as part of the investment scam, the Family Partnership concedes that its loss arose from the Debtor's fraudulent investment scheme.

In sum, on the record before the Court, and based on the allegations in the complaint, the injury suffered by the Family Partnership as a result of the Debtor's fraudulent investment scheme is not significantly different from the injuries incurred by other creditors in general. The claims asserted in the FP Lawsuit are claims that belong to the bankruptcy estate for the benefit of all creditors and the FP Lawsuit is stayed pursuant to section 362(a)(3) of the Bankruptcy Code.  Therefore, at the time of the 341 meeting, the Family Partnership did not have

---

[27] The allegations of wrongdoing by the Family Partnership are also distinguishable from those in  Fairfield Greenwich Ltd., where the bankruptcy court found that claims by customers of a feeder fund were not property of the estate where the customers had deposited funds with the feeder fund, which in turn invested the funds with Madoff, the customers had no interaction with Madoff or his securities firm, and the Madoff receiver previously obtained a court ruling that such customers were not creditors of the Madoff bankruptcy estates.

an interest materially adverse to the creditors of this bankruptcy estate by reason of the FP Lawsuit such that they and each of them were ineligible to vote in a trustee election under section 702(a)(2) of the Bankruptcy Code.

CONCLUSION

Based upon the foregoing, each of the Canadian Northern Creditors, including the Family Partnership, is eligible to request a trustee election and to vote at such election. The objections to the motion of the Canadian Northern Creditors to resolve the election controversy in favor of Mr. Frankel are overruled and such motion is granted to the extent provided herein:

1.      Mr. Frankel shall be appointed as the permanent chapter 7 trustee;

2.      Mr. Pergament shall be relieved as the interim chapter 7 trustee and shall turn over any books and records, and documents to Mr. Frankel by no later than January 15, 2016;

3.      All motions and adversary proceeding brought by or against the chapter 7 trustee shall be held in abeyance for forty-five (45) days pending a review by the permanent trustee; and

4.      A status conference shall be held on February 4, 2016 at 11:30 a.m. whereby the permanent trustee shall provide a status of his investigation and administration of the assets of this case.

So ordered.

**Dated: December 29, 2015**
**Central Islip, New York**

**Louis A. Scarcella**
**United States Bankruptcy Judge**

43

Official Form 417A (12/15)

*[Caption as in Form 416A, 416B, or 416D, as appropriate]*

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

### Part 1: Identify the appellant(s)

1.  Name(s) of appellant(s):

Joseph Rosenberg, Jonathan Zelinger, Petex International Ltd. Ethical Products, Inc., Edward Lowy, Jonathan Leifer, Murray Leifer, Sara Leifer, Whitefish Group, LLC, Saul Kessler, Alfred Schonberger

2.  Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding.

☐ Plaintiff
☐ Defendant
☐ Other (describe) _____

For appeals in a bankruptcy case and not in an adversary proceeding.

☐ Debtor
☑ Creditor
☐ Trustee
☐ Other (describe) _____

### Part 2:  Identify the subject of this appeal

1.  Describe the judgment, order, or decree appealed from: Decision and Order of Bankruptcy Judge Louis A. Scarcella upholding the election of Mark A. Frankel as trustee.
2.  State the date on which the judgment, order, or decree was entered:  12/29/2015

### Part 3: Identify the other parties to the appeal

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1.  Party: See Exhibit A          Attorney: _____
                                              _____
                                              _____
                                              _____

2.  Party: _____          Attorney: _____
                                              _____
                                              _____
                                              _____

## Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court.  If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below.  Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

❑ Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

## Part 5: Sign below

__s/ Lester M. Kirshenbaum_____     Date: 1/12/2016 _____
*Signature of attorney for appellant(s) (or appellant(s)*
*if not represented by an attorney)*
Name, address, and telephone number of attorney
or appellant(s) if not represented by an attorney):

Lester M. Kirshenbaum - (212) 836-8000
Kaye Scholer LLP
250 West 55th Street
New York, New York  10019

_s/ Michael A. Amato_____     Date: 1/12/2016 _____
*Signature of attorney for appellant(s) (or appellant(s)*
*if not represented by an attorney)*
Name, address, and telephone number of attorney
or appellant(s) if not represented by an attorney):

Michael A. Amato - (516) 663-6517
Ruskin Moscou Faltischek, P.C.
1425 RXR Plaza, East Tower, 15th Floor
Uniondale, New York 11553

_s/ Robert J. Spence_____     Date: 1/12/2016 _____
*Signature of attorney for appellant(s) (or appellant(s)*
*if not represented by an attorney)*
Name, address, and telephone number of attorney
or appellant(s) if not represented by an attorney):

Robert J. Spence - (516) 336-2060
Spence Law Office, P.C.
500 N. Broadway, Suite 149
Jericho, NY 11753

__s/ Motty Shulman_____     Date: 1/12/2016 _____
*Signature of attorney for appellant(s) (or appellant(s)*
*if not represented by an attorney)*
Name, address, and telephone number of attorney
or appellant(s) if not represented by an attorney):

Motty Shulman - (914) 749-8200
Boies Schiller & Flexner LLP
333 Main Street
Aramonk, NY 10504

Fee waiver notice:  If appellant is a child support creditor or its representative and appellant has filed the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

## CIVIL COVER SHEET

This form is REQUIRED for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.

IN RE: Bankruptcy Case No. __14-72941-las_____     Adv. Pro. No. *(if applicable)*_____

## **Bankruptcy Appeal**

**APPELLANTS**
Joseph Rosenberg, Jonathan Zelinger, Petex International Ltd. Ethical Products, Inc., Edward Lowy, Jonathan Leifer, Sara Leifer, Murray Leifer, Whitefish Group, LLC, Saul Kessler, Alfred Schonberger

**APPELLEES**
Mark A. Frankel, 169 16th Street, LLC, WL Metro Equity Holdings, LLC, L'Chayim Foundation, Inc., Ludvik and Eva Family Partnership, Law Offices of Allan Lebovits, P.C., as Nominee, Barkany Asset Recovery and Management LLC, Cortland Realty Investments, LLC, Jordan Most, Marshal Eisenberg, Debra Eisenberg Wilder, Janet Pinsky, Shalom Maidenbaum, Rachell Gober, The Boss's Daughter, LLC, Chaim Silberberg, Mr. San, LLC

**ATTORNEYS (FIRM NAME, ADDRESS, TEL., NO.)**
Lester M. Kirshenbaum, Kaye Scholer, 250 W. 55th Street NY, NY 10016, (212) 836-8000; Michael S. Amato, Ruskin Moscou Faltischek, P.C., East Tower, 15th Floor 1425 RXR Plaza Uniondale, NY (516) 663-6600; Robert J. Spence, Spence Law Office, P.C., 500 N. Broadway Suite 149 Jericho NY, (516) 336-2060; Motty Shulman, Boies Schiller & Flexner LLP, 333 Main Street Armonk, NY, (914) 749-8200

**ATTORNEYS (IF KNOWN)**
Shalom Jacob, Allen C. Wasserman, Alan H. Katz, Locke Lord LLP, 3 World Financial Center NY, NY 10281, (212) 415-8600; Robert Rimberg, Goldberg & Rimberg PLLC, 115 Broadway, 3rd Floor NY, NY 10006, (212) 697-3250; Joel Schneck, Schachter Portnoy, L.L.C. 3490 U.S. Route 1, Suite 6, Princeton, NJ 08540, (609) 514-8668

BASIS OF JURISDICTION: Federal Question

CAUSE OF ACTION - 28:1334 Bankruptcy Appeal *(Write brief statement of cause.)*
 Challenge to the eligibility of voting creditors to vote in a contested election for bankruptcy trustee.

NATURE OF SUIT: 422 Bankruptcy Appeal (801)

RELATED CASE(S) IN <u>DISTRICT COURT</u>, IF ANY

DISTRICT JUDGE Judge Leonard D. Wexler; Magistrate Judge Arlene R. Lindsay     DOCKET NUMBER __13-cr-00362-ldw-arl__

*CIVIL CASES ARE DEEMED RELATED IF PENDING CASE INVOLVED:*

☐ *1. PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT*
☐ *2. SAME ISSUE OF FACT OR GROWS OUT OF THE SAME TRANSACTION*
☐ *3. VALIDITY OR INFRINGEMENT OF THE SAME PATENT COPYRIGHT OR TRADEMARK*

| Date: | 1/12/2016 | Signature of Attorney of Record: **s/ Lester M. Kirshenbaum** |
| | | *[or Appellant Pro Se]* |
| Date: | 1/12/2016 | Signature of Attorney of Record: **s/ Michael A. Amato** |
| | | *[or Appellant Pro Se]* |
| Date: | 1/12/2016 | Signature of Attorney of Record: **s/ Robert J. Spence** |
| | | *[or Appellant Pro Se]* |
| Date: | 1/12/2016 | Signature of Attorney of Record: **s/ Motty Shulman** |
| | | *[or Appellant Pro Se]* |

*FOR COURT USE ONLY*

APPLYING IFP_____     JUDGE_____     MAG. JUDGE_____

**CIVIL COVER SHEET, Bankruptcy Appeal** (cont'd)

Did the cause of action arise in Nassau or Suffolk County?___Yes_____

If YES, please indicate which county:___Nassau_____

Each attorney noted below is currently admitted in the Eastern District of New York and currently a member of good standing of the bar of this court and is not currently the subject of any disciplinary action(s) in this or any other state or federal court.

YES  [✔]            NO  [ ]

Please provide your bar code and e-mail address below. Your bar code consists of the initials of your first and last name and the last four digits of your social security number, or any other four-digit number registered by the attorney with the Clerk of Court. This information must be provided pursuant to local rule 11.1(b) of the local civil rules.

Attorney Bar Code: LK8139_____

E-Mail Address: lester.kirshenbaum@kayescholer.com_____

Attorney Bar Code: MA5225_____

E-Mail Address: mamato@rmfpc.com _____

Attorney Bar Code: RS3506_____

E-Mail Address: rspence@spencelawpc.com_____

Attorney Bar Code: MS0351_____

E-Mail Address: mshulman@BSFLLP.com _____

USBC-84 [r.4/10/03]]

## EXHIBIT A

List the names of all parties to the judgment, order, or degree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

| Party | Attorney |
|---|---|
| Mark A. Frankel | Backenroth Frankel & Krinsky LLP<br>800 Third Avenue<br>11th Floor<br>New York, NY 10022<br>(212) 593-1100 |
| 169 16th Street, LLC | Robert L. Rimberg<br>GOLDBERG & RIMBERG PLLC<br>115 Broadway, 3rd Floor<br>New York, NY 10006<br>(212) 697-3250<br><br>Joel S. Schneck<br>SCHACHTER PORTNOY, L.L.C.<br>3490 U.S. Route 1, Suite 6<br>Princeton, New Jersey 08540<br>(609) 514-8668<br>jss@splawoffice.com |
| WL Metro Equity Holdings, LLC | Robert L. Rimberg<br>GOLDBERG & RIMBERG PLLC<br>115 Broadway, 3rd Floor<br>New York, NY 10006<br>(212) 697-3250<br><br>Joel S. Schneck<br>SCHACHTER PORTNOY, L.L.C.<br>3490 U.S. Route 1, Suite 6<br>Princeton, New Jersey 08540<br>(609) 514-8668<br>jss@splawoffice.com |

| | |
|---|---|
| L'Chayim Foundation, Inc. | Robert L. Rimberg<br>GOLDBERG & RIMBERG PLLC<br>115 Broadway, 3rd Floor<br>New York, NY 10006<br>(212) 697-3250<br><br>Joel S. Schneck<br>SCHACHTER PORTNOY, L.L.C.<br>3490 U.S. Route 1, Suite 6<br>Princeton, New Jersey 08540<br>(609) 514-8668<br>jss@splawoffice.com |
| Ludvik and Eva Family Partnership | Robert L. Rimberg<br>GOLDBERG & RIMBERG PLLC<br>115 Broadway, 3rd Floor<br>New York, NY 10006<br>(212) 697-3250<br><br>Joel S. Schneck<br>SCHACHTER PORTNOY, L.L.C.<br>3490 U.S. Route 1, Suite 6<br>Princeton, New Jersey 08540<br>(609) 514-8668<br>jss@splawoffice.com |
| Law Offices of Allan Lebovits, P.C., as Nominee | Robert L. Rimberg<br>GOLDBERG & RIMBERG PLLC<br>115 Broadway, 3rd Floor<br>New York, NY 10006<br>(212) 697-3250<br><br>Joel S. Schneck<br>SCHACHTER PORTNOY, L.L.C.<br>3490 U.S. Route 1, Suite 6<br>Princeton, New Jersey 08540<br>(609) 514-8668<br>jss@splawoffice.com |
| Barkany Asset Recovery and Management LLC | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281<br>Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |

Notice of Appeal Exhibit A

| | |
|---|---|
| Cortland Realty Investments LLC | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281<br>Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |
| Jordan Most | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281<br>Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |
| Marshal Eisenberg | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281<br>Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |
| Debra Eisenberg Wilder | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281<br>Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |
| Seth Farbman | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281<br>Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |
| Janet Pinsky | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281 |

Notice of Appeal Exhibit A

| | |
|---|---|
| | Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |
| Shalom Maidenbaum | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281<br>Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |
| Rachell Gober | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281<br>Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |
| The Boss's Daughter, LLC | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281<br>Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |
| Chaim Silberberg | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281<br>Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |
| Mr. San, LLC | Shalom Jacob<br>Allen C. Wasserman<br>Alan H. Katz<br>LOCKE LORD LLP<br>3 World Financial Center<br>New York, New York 10281<br>Telephone: (212) 415-8600<br>Facsimile: (212) 303-2754 |

Notice of Appeal Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
In re:                                           :
                                                 :          **Chapter No. 8-14-72941-las**
                                                 :
**GERSHON BARKANY,**                             :          **Chapter 7**
                                                 :
                                                 :
                            Debtor.              :
-----------------------------------------------------------x

### AFFIDAVIT OF SERVICE

STATE OF NEW YORK        :
                         :.ss:
COUNTY OF NEW YORK   :

      TIMOTHY S. LANGSDORF, being duly sworn, deposes and says that he is employed by the law firm of Kaye Scholer LLP, is over the age of eighteen years and is not a party to this action.

      On January 12, 2016, deponent served a true and correct copy of the *Notice of Appeal and Statement of Election, Civil Cover Sheet and Exhibit A* [Docket #298] by overnight mail upon the parties listed in Exhibit A.

                                     _____
                                         Timothy S. Langsdorf

Sworn to before me this
12ᵗʰ day of January, 2016

Notary Public, State of New York

CYNTHIA M. ALBERT
Notary Public, State of New York
No. 01AL6321409
Qualified in Bronx County
Certificate Filed in New York County
Commission Expires March 16, 2019

62822698_1                                    1

<u>Exhibit A</u>

Mark A. Frankel
Backenroth Frankel & Krinsky LLP
800 Third Avenue
11th Floor
New York, NY 10022

Robert L. Rimberg
Goldberg & Rimberg PLLC
115 Broadway, Suite 302
New York, NY 10006

Joel S. Schneck
Schachter Portnoy, L.L.C.
3490 U.S. Route 1, Suite 6
Princeton, NJ 08540

Shalom Jacob
Locke Lord LLP
3 World Financial Center
New York, NY 10281

Allen C. Wasserman
Locke Lord LLP
3 World Financial Center
New York, NY 10281

Alan H. Katz
Locke Lord LLP
3 World Financial Center
New York, NY 10281

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------x
In re: Gershon Barkany

Case No. 8-14-72941-las

Chapter 7

---------------------------------------------------x

**NOTICE TO PARTIES CONCERNING APPEAL** (*ECF CASE*)

A Notice of Appeal was filed in the above case by **Joseph Rosenberg, Jonathan Zelinger, Ethical Products Inc et al**

on **January 12, 2016**                                  .

Please observe the following, pursuant to Bankruptcy Rules 8001, 8004 and 8006, Local Rules 8004-1 and 8007-1, and established local practice in the Bankruptcy Court and District Court:

1.       *Service of Notice:* Unless the appellant has already served notice of the filing of the notice of appeal (as evidenced by a certificate of service), the appellant must provide the Clerk with the e-mail address of each party to be served; to the extent that there are parties to the appeal who are not equipped to receive e-mail notification, the appellant must provide the Clerk with sufficient copies of the notice and address labels for all such parties to be served.

2.       *Appellant's Designation:* Appellant's designation of record on appeal and statement of issues to be presented on appeal are due within fourteen (14) days of the date of filing the **later** of the following, as applicable: (a) the notice of appeal; (b) entry of an order granting leave to appeal; or (c) entry of an order disposing of the last timely motion outstanding of a type specified in Bankruptcy Rule 8002(b). A copy of the designation and statement shall be served by the appellant on the appellee.

3.       *Appellee's Designation:* Within fourteen (14) days after service of the appellant's designation and statement, the appellee may file and serve on the appellant a designation of additional items to be included in the record on appeal.

4.       *Copy of Record:* Each party who has filed a designation must provide this office with a copy of the items designated in PDF format. The designated items may be submitted as attachments to the designation, or separately at a later date, if necessary.

5.       *Transcripts:* If the record designated by any party includes a transcript of any proceeding or a part thereof, the party shall, immediately after filing the designation, deliver to the reporter and file with the clerk a written request for the transcript and make satisfactory arrangements for payment of its cost. Designated transcripts must be provided to this office in PDF format.

6.       *ECF Registration:* Documents must be filed electronically relative to this matter, both in the Bankruptcy Court and, once the record has been transmitted, in the District Court. Registration is required at both Courts. For information on ECF registration in the Bankruptcy Court, visit **www.nyeb.uscourts.gov/cm_ecf.htm**; for District Court information, visit **www.nyed.uscourts.gov/CM_ECF/cm_ecf.htm**.

It is the duty of the parties to insure that the record on appeal is complete. An incomplete record will otherwise be transmitted, for disposal as the District Court shall determine.  The deadline for transmission of the record will be set for thirty (30) days from the filing with the Court of the appellant's designation of record, or from the deadline for the said filing, whichever is earlier.

Dated: **Central Islip, New York 1172**
         **January 13, 2016**

FOR THE COURT

s/  S Dolan

# Notice Recipients

| District/Off: 0207–8 | User: sdolan | Date Created: 1/13/2016 |
|---|---|---|
| Case: 8–14–72941–las | Form ID: pdf000 | Total: 12 |

**Recipients of Notice of Electronic Filing:**

| ust | United States Trustee | USTPRegion02.LI.ECF@usdoj.gov |
|---|---|---|
| aty | Alan H Katz | akatz@lockelord.com |
| aty | Allen C Wasserman | awasserman@lockelord.com |
| aty | Joel S Schneck | jss@grf–law.com |
| aty | Joel S Schneck | jss@splawoffice.com |
| aty | Lester M Kirshenbaum | lester.kirshenbaum@kayescholer.com |
| aty | Mark A. Frankel | mfrankel@bfklaw.com |
| aty | Michael S Amato | mamato@rmfpc.com |
| aty | Motty Shulman | mshulman@bsfllp.com |
| aty | Shalom Jacob | sjacob@lockelord.com |

TOTAL: 10

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| ROBERT SPENCE | SPENCE LAW OFFICE PC | 500 N BROADWAY SUITE 149 | JERICHO, NY 11753 |
|---|---|---|---|
| ROBERT L RIMBERG | GOLDBERG & RIMBERG PLLC | 115 BROADWAY SUITE 302 | NEW YORK, NY 10006 |

TOTAL: 2